UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                            :
UMB BANK, N.A., solely in its capacity                      :
as Trustee under the Contingent Value                       :
Rights Agreement by and between                             :
Bristol-Myers Squibb Company and                            :
Equiniti Trust Company, dated as of                         :
November 20, 2019,                                          :
                                                            :
                                        Plaintiff,          :
                                                            :        Case No. 1:21-cv-04897 (JMF)
         v.                                                 :
                                                            :
                                                            :
BRISTOL-MYERS SQUIBB COMPANY,                               :
                                                            :
                                        Defendant.          :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**REPLY MEMORANDUM IN FURTHER SUPPORT
OF BRISTOL-MYERS SQUIBB COMPANY'S
MOTION TO DISMISS THE COMPLAINT**

John J. Clarke, Jr.
Jessica A. Masella
Jessica Park Wright
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company

Dated:  October 14, 2021

Table of Contents

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ................................................................................................................................2

I.       THE UNAMBIGUOUS CONTRACT TERMS REQUIRE DISMISSAL .........................2

         A.     There Must Be an Event of Default Before the Trustee Can Sue ...........................2

         B.     No Event of Default Arose from the Trustee's Untimely Notice ...........................4

              1.     A Default Is Actionable Only if It Becomes
                      an Event of Default .....................................................................................4

              2.     The Trustee's Arguments Conflict With
                      the Contract .................................................................................................5

         C.     The CVR Agreement Cannot Be Rewritten Based on the
              Trustee's Hindsight Views of "Commercial Reasonableness" ..............................8

         D.     The Prevention Doctrine Does Not Apply .............................................................11

II.     THE BOOKS AND RECORDS CLAIM ALSO SHOULD BE DISMISSED .................13

CONCLUSION .............................................................................................................................13

Table of Authorities

Page(s)

Cases

*Amies v. Wesnofske*,
   255 N.Y. 156 (1931) ...................................................................................................11

*Bakal v. U.S. Bank, N.A.*,
   747 F. App'x 32 (2d Cir. 2019) ...................................................................................13

*Consol. Edison, Inc. v. Northeast Utils.*,
   426 F.3d 524 (2d Cir. 2005)........................................................................................11

*Cortlandt St. Recovery Corp. v. Bonderman*,
   31 N.Y.3d 30 (2018) .................................................................................................2, 6

*Giuffre Hyundai Ltd. v. Hyundai Motor Am.*,
   756 F.3d 204 (2d Cir. 2014)..........................................................................................9

*Greenfield v. Philles Records Inc.*,
   98 N.Y.2d 562 (2002) .................................................................................................11

*Hammond v. Bank of New York Mellon Corp.*,
   No. 08 Civ. 6060 (RMB), 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ...............13

*HGCD Retail Servs. LLC v. 44-45 Broadway Realty Co.*,
   826 N.Y.S.2d 190 (1st Dep't 2006) ...........................................................................11

*In re Taddeo*,
   685 F.2d 24 (2d Cir. 1982).......................................................................................5, 7

*Kass v. Kass*,
   91 N.Y.2d 554, 673 N.Y.S.2d 350 (1998) ..................................................................6

*Law Debenture Tr. Co. v. Maverick Tube Corp.*
   595 F.3d 458 (2d Cir. 2010)................................................................................ *passim*

*Lockheed Martin Corp. v. Retail Holdings NV*,
   639 F.3d 63 (2d Cir. 2011)................................................................................ 2, 3-4

*Met. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990)........................................................................4, 5, 10, 11

*N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*,
   481 F. Supp. 3d 216 (S.D.N.Y. 2020)..................................................................... 6-7

ii

Page(s)

*Quadrant Structured Prods. Co. v. Vertin*,
  23 N.Y.3d 549 (2014) ....................................................................................................2, 11

*Royal Park Invs. S.A./N.V. v. Deutsche Bank Nat'l Tr. Co.*,
  No. 14 Civ. 4394 (AJN), 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016) ....................................12

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
  691 F.2d 1039 (2d Cir. 1982)..................................................................................................3

*Thor Props., LLC v. Chetrit Grp. LLC*,
  936 N.Y.S.2d 196 (1st Dep't 2012) .......................................................................................11

*UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*,
  128 N.Y.S.3d 823 (N.Y. Sup. Ct. 2020) ...................................................................2, 3, 4, 11

*U.S. Bank N.A. v. U.S. Timberlands Klamath Falls L.L.C.*,
  C.A. No. 112-N, 2004 WL 1699057 (Del. Ch. July 29, 2004).............................................2, 4

*U.S. Bank N.A. v. Windstream Servs. LLC*,
  No. 17 Civ. 7857 (JMF), 2017 WL 5054726 (S.D.N.Y. Nov. 1, 2017) ............................... 4-5

## Statutes and Rules

15 U.S.C. § 77ppp(a) .................................................................................................................3

15 U.S.C. § 77ooo(d)(3) .............................................................................................................3

## Other Authorities

Am. Bar. Found., *Commentaries on Model Debenture
  Indenture Provisions* (1971) ........................................................................................ *passim*

**PRELIMINARY STATEMENT**

The Trustee misreads the CVR Agreement in a transparent attempt to create ambiguity where none exists. *See* Opp. at 20 n.7. The applicable provisions are clear and require dismissal. There has been no Event of Default, and the Trustee is not empowered to sue for breach, because neither the Trustee nor any other party provided notice to BMS of its alleged covenant defaults until *months after* the CVR Agreement terminated automatically. By then, no default could continue for ninety days – and therefore become an Event of Default – because the relevant covenants had no continuing "force or effect." *See* CVR Agreement §§ 1.16, 8.1(b).

Requiring a post-notice cure period before a default turns into an "Event of Default" has been a term in trust indentures for generations. The requirement provides assurance to the issuer that it can prevent litigation by correcting an identified non-payment default before the right to sue for such a breach will even arise. In this instance, it also protects against hindsight breach-of-contract claims asserted as a type of investment insurance for CVR investors disappointed that one of three FDA approval conditions was obtained too late for them to receive payment. The Trustee's arguments would strip BMS of its bargained-for contract right, eliminate the long-recognized distinction between a default and an Event of Default in trust indentures, and reduce the cure period's function to purposeless delay.

According to the Trustee's own allegations, there was ample time to provide notice of the Company's alleged defaults while the CVR Agreement still was in effect. CVR investors allegedly knew BMS had breached its Diligent Efforts covenant by May 2020. Compl. ¶ 56. But no one provided written notice of that purported breach – then or for months thereafter – so that it could be addressed while BMS still had the ability to do so. *Id.* ¶ 86. The Trustee cannot rewrite the agreement now based on hindsight arguments about "commercial reasonableness." The failure to timely comply with the unambiguous pre-suit notice requirement requires dismissal.

**ARGUMENT**

**I.    THE UNAMBIGUOUS CONTRACT TERMS REQUIRE DISMISSAL.**

The Event of Default requirement is "unambiguous on its face" and "must be enforced according to its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011); *see Quadrant Structured Prods. Co. Ltd. v. Vertin*, 23 N.Y.3d 549, 564 (2014) (same). None of the Trustee's internally contradictory arguments to escape the plain language of the CVR Agreement withstand scrutiny. *See Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("'[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations'").

**A.    There Must Be an Event of Default Before the Trustee Can Sue.**

Contrary to the Trustee's argument, section 8.9(b) of the CVR Agreement does not grant it "discretion" to sue BMS whenever it "deem[s] that a lawsuit is proper." Opp. at 22. Section 8.9(b) protects the Trustee from liability when it acts at the direction of "Majority Holders." It does not provide an exception to the Event of Default requirement for bringing suit.

An indenture both defines and limits the role of an indenture trustee. *See Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39-40 (2018). To that end, sections 8.1 and 8.4 of the CVR Agreement make clear that the Trustee cannot bring suit for breach unless and until there has been an Event of Default. CVR Agreement §§ 8.1, 8.4; *see UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*, 128 N.Y.S.3d 823, 826 (N.Y. Sup. Ct. 2020) (fraudulent transfer complaint); *U.S. Bank N.A. v. U.S. Timberlands Klamath Falls L.L.C.*, 2004 WL 1699057, at *3 (Del. Ch. July 29, 2004) (breach of contract complaint). Substantially similar Event of Default provisions have been included in trust indentures for generations. *See* Am. Bar. Found., *Commentaries on Model Debenture Indenture Provisions* (1971) ("*Commentaries*"), §§ 5-1(3), 5-3.

2

Section 8.9 serves a different function.  It incorporates Trust Indenture Act provisions that govern the relationship between holders and a trustee.  Section 8.9(a) provides Majority Holders "the right to direct the time, method and place" for the Trustee to conduct any proceeding or exercise any power under the CVR Agreement.   CVR Agreement § 8.9(a); s*ee* 15 U.S.C. § 77ppp(a) (same).  Section 8.9(b), in turn, provides that the CVR Agreement:

> shall not impair the right of the Trustee in its discretion to take any action deemed proper by the Trustee *and which is not inconsistent with such direction or directions by Holders.*

(Emphasis added).  The provision follows section 315 of the Act, which presumptively deems such an exculpation clause to be a term in every indenture.  *See* 15 U.S.C. § 77ooo(d)(3) (unless stating otherwise, every indenture shall be deemed to include a provision "protecting the indenture trustee" for actions taken "in accordance with the direction of the [majority] holders").[1]

Section 8.9(b) gives the Trustee a defense against Holder claims.  As long as it takes action that it "deem[s] proper" *and* that "is not inconsistent with … directions" given by Majority Holders, the Trustee cannot be held liable.  CVR Agreement § 8.9(b); *see id.* § 4.1(c) (Trustee "shall not be liable" for actions "taken or omitted" in good faith "in accordance with the direction of the Holders pursuant to Section 8.9").  But the Trustee's right, "in its discretion," to take actions "not inconsistent with" directions from Majority Holders does not grant it discretion to disregard the Event of Default requirement for bringing suit.  *Lockheed Martin*, 639 F.3d at 69 ("courts examining isolated provisions should . . . choose that construction which will carry out the plain purpose and object of the [agreement].'"); *Maverick Tube*, 595 F.3d at 468 (courts must read

---

[1] Trust indenture provisions must be applied consistently to ensure "that the rights pertaining to [the underlying] securities [are] certain and predictable to both investors and issuers." *Neiman Marcus*, 128 N.Y.S.3d at 828; *see Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) ("A large degree of uniformity in the language of debenture indentures is essential to the effective functioning of the financial markets.").

contract as a whole "'to ensure that undue emphasis is not placed upon particular words and phrases'"). The Trustee knows this, which is why it alleged an Event of Default and waited ninety days after its alleged (untimely) notice before filing the complaint. *See* Compl. ¶ 86; Opp. at 1.[2]

### B.       No Event of Default Arose from the Trustee's Untimely Notice.

The Trustee's main argument – that under the CVR Agreement any "pre-termination breach becomes an Event of Default if it continues for ninety days after notice, irrespective of the termination date," Opp. at 4 – is also mistaken.

### 1.       A Default Is Actionable Only if It Becomes an Event of Default.

Under the CVR Agreement, as with other trust indentures, non-payment breaches "are not automatic events of default but may become events of default after formal written notice is given to the Company and the default *continues for a grace period* after such notice." *Commentaries*, § 5-1(3) at 207 (emphasis added). The CVR Agreement includes language virtually indistinguishable from the model provision in the *Commentaries*. It provides that a covenant "default" does not become an "Event of Default" unless the Company's "material default in the performance" of a non-payment covenant continues for ninety days *after* notice "specifying" the default and "requiring it to be remedied[.]" *Id.* § 8.1(b); *see* Commentaries, § 5-1(3).

The distinction drawn in the CVR Agreement between a default and an Event of Default is common in trust indentures and well-recognized by the courts. *Neiman Marcus*, 128 N.Y.S.3d at 827; *U.S. Timberlands Klamath Falls*, 2004 WL 1699057, at *3; *see Met. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 890-91 (2d Cir. 1990) ("*MetLife*") (reversing preliminary injunction that extended cure period to prevent default from becoming Event of Default); *U.S. Bank N.A. v.*

---

[2] The Trustee's untimely notice letter also failed to comply with several other contractual requirements, including by assuming that sending the letter was itself sufficient to give rise to an Event of Default. BMS reserves all defenses based on these additional failures.

*Windstream Servs. LLC*, 2017 WL 5054726 (S.D.N.Y. Nov. 1, 2017) (Furman, J.) (tolling cure period to defer occurrence of Event of Default to permit litigation of alleged default).

Further, the grace period is an important contract right.  It allows an issuer to avoid litigation by correcting an identified default before a trustee or holders have any right to sue.  *See In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982) ("Curing a default commonly means taking care of the triggering event and returning to pre-default conditions.  The consequences are thus nullified.").  But an alleged covenant default cannot "continu[e]" for ninety days when, as here, the Trustee does not send a purported notice *until after* the CVR Agreement has terminated.  After termination, the Company's covenants have no further "force or effect," and BMS has no further "obligations" under them.  CVR Agreement § 1.16.

By the time the Trustee allegedly sent its notice on March 4, 2021 – more than two months after termination – BMS no longer had an obligation to use Diligent Efforts.  Equally important, it was no longer possible for BMS to "take care of the triggering event" raised in the notice, *Taddeo*, 685 F.2d at 26-27, because BMS did not have the ability to turn back time.  The liso-cel milestone date was months in the past, and the FDA already had approved the BLA.  By requiring notice while the Company still has a chance to "take care of" an alleged covenant breach, the CVR Agreement protects BMS against such an impossible predicament.

### 2.    The Trustee's Arguments Conflict With the Contract.

The Trustee erroneously contends that termination of the CVR Agreement makes no difference.  In its view, section 8.1(b) only requires written notice of an alleged breach and the passage of ninety days.  Opp. at 4, 14-15.  That understanding is wrong for several reasons.

*First*, it cannot be squared with the plain language of section 8.1(b).  An Event of Default requires a "material default *in the performance* . . . of any covenant . . . and *continuance of such*

*default* for a period of ninety (90) days *after*" the notice.  CVR Agreement § 8.1(b) (emphasis added).  Because the Company's deficient "performance" must "continu[e]" for ninety days after notice, a default of a covenant that has no continuing "force or effect" throughout the ninety-day cure period cannot give rise to an Event of Default.  *See Kass v. Kass*, 91 N.Y.2d 554, 568 (1998) (rejecting interpretation which "ignore[d] . . . words that also must be given meaning").  This is consistent with the general understanding of grace periods in trust indentures.  *See Cortlandt St. Recovery Corp.*, 31 N.Y.3d at 40 (Event of Default includes failure "to comply for 60 days after notice" with non-payment covenant); *Commentaries*, § 5-1(3), at 207 (event of default only if non-payment breach "continues for a grace period after such notice").

The Trustee has no answer to this textual problem, so it reframes the issue in an attempt to fit within a discussion about a different kind of contract in *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216 (S.D.N.Y. 2020).  The Trustee asserts that *N.Y. Wheel* stands for the proposition that termination of a contract "does not eliminate liability for pre-termination breaches."  Opp. at 16 (discussing *N.Y. Wheel*, 481 F. Supp. 3d at 237).  But even if that were a universal rule (which even *N.Y. Wheel* recognizes it is not), it would be beside the point.

The plaintiff in *N.Y. Wheel* sued under a completion guaranty after a joint venture breached the underlying contract.  The guarantors had agreed to provide "performance or payment" if a breach of the underlying contract "ha[d] occurred and [was] continuing."  *N.Y. Wheel*, 481 F. Supp. 3d at 236.  The Court disagreed with the defendants' assertion that an underlying breach was not "continuing" after the contract was terminated, concluding that, in context, the word "continuing" was "more reasonably read to prohibit" a claim only after a breach had been cured, not after termination, especially because the guaranty "survive[d]" termination.  *Id.* at 237.

6

Unlike the CVR Agreement, however, the guaranty agreement in *N.Y. Wheel* did not distinguish between "defaults" and "Events of Default" or include a notice-and-cure provision that required a breach to continue for a grace period before it became actionable. Nor had the plaintiff in *N.Y. Wheel* waited until months after the agreement terminated to send a mandatory notice of default. (A different contract in *N.Y. Wheel* had a notice requirement, which the Court enforced. 481 F. Supp. 3d at 246.) Contrary to the Trustee's mistaken understanding, the complaint in this case should be dismissed because the breaches it alleges *are not actionable*, not because termination of the contract "eliminate[d] liability." Opp. at 16.[3]

*Second*, the Trustee's reading would strip BMS of an important right expressly provided by section 8.1(b) – to avoid litigation by addressing an alleged breach during the cure period. *See Commentaries*, § 5-1(3) at 207. Under the Trustee's view, however, the cure period serves no function other than postponing the inevitable start of litigation. *See* Opp. at 1, 4, 15.

According to the Trustee, BMS could have prevented the filing of a lawsuit after it received the Trustee's untimely notice by "remedy[ing] its breaches . . . through the payment of money." Opp. at 18. Neither the plain language of the CVR Agreement nor the established understanding of what it means to cure (or "remedy") a default support that argument. *See Taddeo*, 685 F.2d at 26-27 ("[c]uring a default" means "taking care of the triggering event and returning to pre-default conditions"); *Commentaries*, § 5-1(3) at 207 (discussing nearly identical model provision; observing that many covenants "while important, are not critical" and defaults "are not automatic events of default but may become events of default" if one "continues for a grace period after notice").

---

[3] The Trustee's assertion that the CVR Agreement does not include "express language" of release is mistaken for the same reason. Opp. at 19 & n.6.

The argument also conflicts with common sense.  No issuer would choose to avoid litigation concerning an alleged covenant breach by pre-paying possible damages in an as-yet unfiled lawsuit.  Nor was BMS required to "reinstate" the CVR Agreement or agree to "waive[] or extend[]" the expired milestone date in response to the untimely notice, as the Trustee also argues.  Opp. at 18; *see MetLife*, 906 F.2d at 889 ("The parties having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded.'").

*Finally*, the Trustee's interpretation also conflicts with section 1.16, under which the covenants to use Diligent Efforts and to permit inspection of records ceased to have "force or effect" when the agreement terminated.  CVR Agreement § 1.16.  The survival provision in section 1.16 does not permit an Event of Default to arise from a post-termination notice of an alleged covenant default, as the Trustee mistakenly asserts.  Opp. at 4, 14-15.  That provision states that termination "shall not relieve any Party of any liability arising from any material breach of its obligations . . . occurring prior to the Termination Date" and includes "Article 8" among the provisions that survive.  CVR Agreement § 1.16.  But neither part of the carve-out alters the requirement that a "material default in [ ] performance" of a non-payment covenant must "continu[e]" for ninety days – after notice – before it becomes an actionable Event of Default.  *Id.* § 8.1(b).  After termination, as before, there is no right of action for alleged covenant defaults unless there is an Event of Default (and it is for those circumstances that BMS must keep records for three years, *id.* § 7.5; *see* Opp. at 19 n.5).

**C.      The CVR Agreement Cannot Be Rewritten Based on the Trustee's Hindsight Views of "Commercial Reasonableness."**

The Trustee repeatedly decries the unfairness of the notice-and-cure requirement and suggests it would be "commercially unreasonable" to enforce the plain terms of the

CVR Agreement.  Opp. at 17 (citation omitted); *id*. at 1, 4, 14, 18.  However, the CVR Agreement

cannot be rewritten to conform to the Trustee's mistaken and hindsight views about "commercial

reasonableness."

According to the complaint, "[t]he market" knew by May 2020 about the Company's

alleged breach of the Diligent Efforts covenant and its potential impact on the liso-cel milestone.

Compl. ¶ 56.  Allegedly in response, the price of CVRs, "which had been trading at $4.50 at the

end of April 2020, dropped to just $3.00." *Id*.  But there is no allegation that anyone provided

notice of the Company's alleged breach then – or any time before the liso-cel milestone date

(December 31, 2020).  Instead, they waited:  there would be no need for litigation if BMS met the

milestones, but (under the Trustee's mistaken reading) there would be plenty of time for litigation

if the conditions to payment on the CVRs were not met.  The CVR Agreement prohibits such a

wait-and-see approach to protect BMS against that kind of "heads I win, tails you lose" obligation.[4]

Contrary to the Trustee's arguments, a plain reading of the CVR Agreement does not

"immunize" BMS for any breach of contract alleged in the complaint.  Opp. at 1, 4-5, 17; *see*

*Neiman Marcus*, 128 N.Y.S.3d at 825 (rejecting identical argument made by the same indenture

trustee).  There is no allegation that anyone – including BMS – knew that the CVR Agreement

would automatically terminate when it did.  Even near the end of December 2020, the contract *still*

might have remained in effect for more than ninety days.  But even though the Trustee sent BMS

a letter two days before the liso-cel milestone date, allegedly because "certain CVR holders"

---

[4] The Trustee's allegations also defeat its assertion that notice would have been "useless." Opp. at 18 n.3.  It mistakenly cites the inapposite decision in *Giuffre Hyundai Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209-10 (2d Cir. 2014), which concerned a contract provision requiring notice-and-cure before *termination*.  A far stricter standard applies to establish futility of providing notice-and-cure before *filing suit*, and it is not met here.  *See* Defs. Mem. at 17 n.16.

"became concerned" by "news of . . . mishandled inspections," Compl. ¶ 13, the Trustee elected not to assert any notice of default in the letter. *See id.* ¶¶ 15, 75.

Like the condition of Schrödinger's cat, it cannot be known whether the CVR Agreement would have terminated after December 31, 2020 if the Trustee actually had provided a notice of default before the milestone date. But even if there had been such a notice and the FDA still did not approve liso-cel in time (so that the CVR Agreement terminated before the grace period could elapse) there would be no ambiguity. Just as some defaults might never be the subject of a notice of default, other defaults might be the subject of a notice that is sent too late. In either instance, no Event of Default would arise. The CVR Agreement is not unique in that respect. *See MetLife*, 906 F.2d at 888 (district court did not toll cure period for two of six indentures, in part, because notes reached maturity before cure period elapsed).

The Trustee's hypotheticals do not change the analysis. There is no allegation that BMS "abandon[ed] its obligations, [took] no action," or "with[drew] the BLA" during the ninety days before the CVR Agreement automatically terminated. Opp. at 4; *see id.* at 17. To the contrary, the complaint alleges that BMS worked until the milestone date to obtain FDA approval for liso-cel, but the FDA did not act in time; the agreement therefore terminated automatically, as its terms expressly contemplated, without BMS receiving any notice that it was in breach of any covenant. Compl. ¶¶ 10, 67, 72, 79, 86. There is nothing "absurd" or "irrational[]" about applying the unambiguous terms of the CVR Agreement to dismiss that claim. Opp. at 1, 4, 17.

Nor can the Trustee escape the consequences of its inaction through its arguments for reformation of the CVR Agreement. Any suggestion that the CVR Agreement "should be read to accomplish what the Trustee views as 'commercial[ly]' 'reasonable' . . . essentially asks [the Court] to rewrite" the agreement, which is contrary to New York law. *Maverick Tube*, 595 F.3d

at 472.  When an agreement "'on its face is reasonably susceptible of only one meaning, a court is

not free to alter the contract to reflect its personal notions of fairness and equity.'"  *Id.* at 468

(quoting *Greenfield v. Philles Records Inc.*, 98 N.Y.2d 562, 570 (2002)).[5]

### D.       The Prevention Doctrine Does Not Apply.

The Trustee mistakenly argues that the "prevention doctrine" applies because termination

of the CVR Agreement "caused the failure" of the Event of Default requirement.  Opp. at 21.  The

lack of timely notice of default, not termination of the contract, is why there was no Event of

Default.  There is no role for the "prevention doctrine" in this case.  *See Amies v. Wesnofske*,

255 N.Y. 156, 164-65 (1931) (refusing to apply doctrine where defendants "neither prevented nor

hindered performance").

Further, the "prevention doctrine" does not permit the Court to rewrite the

CVR Agreement.  *Consol. Edison, Inc. v. Northeast Utils.*, 426 F.3d 524, 529 (2d Cir. 2005)

(prevention doctrine not available when it would act at "cross-purposes" to parties' intent); *see,*

*e.g., Thor Props., LLC v. Chetrit Grp. LLC*, 936 N.Y.S.2d 196, 198 (1st Dep't 2012) (refusing to

apply doctrine); *HGCD Retail Servs. LLC v. 44-45 Broadway Realty Co.*, 826 N.Y.S.2d 190, 198-

99 (1st Dep't 2006) (same).

Section 1.16 provides that the CVR Agreement will terminate "*automatically*, and without

further action of any [p]arty," if the FDA does not approve liso-cel by its milestone date.

CVR Agreement § 1.16 (emphasis added).  There are no exceptions to termination if the Trustee

---

[5] *See also MetLife*, 906 F.2d at 891 (reversing court-ordered extension of cure period that "radically alter[ed] [the] status [quo] by permanently changing the cure provisions"); *Quadrant Structured Prods.*, 23 N.Y.3d at 564 ("where the language of the contract is clear we rely on the terms of the document"); *Neiman Marcus*, 128 N.Y.S.3d at 828 (noting possible benefits "to unwinding pre-Event-of-Default fraudulent conveyances" but holding that indenture did not grant trustee the right to seek such relief).

alleges, in hindsight, that BMS caused a failure to meet the milestone.  The language used in the contract is definitive.  *See id.* (providing for automatic termination "if as of the Initial Milestone Target Date, either the JCAR017 Milestone or the Ozanimod Milestone *has not occurred*") (emphasis added).

Nor does section 7.11 of the CVR Agreement provide a basis for implying an exception to the termination provision.  Section 7.11 requires BMS to file written notice with the Trustee "of the occurrence of any Event of Default or other default" within five business days "*of its becoming aware* of such Event of Default or other default."   CVR Agreement § 7.11 (emphasis added).  However, the complaint does not allege BMS ever was "aware" that it was in breach.  (Indeed, BMS denies there ever was a breach.)[6]

Assertions that a major amendment letter is "extremely rare," or that BMS knew inspections "were critical" for obtaining FDA approval, Opp. at 21-22, fall far short of alleging that BMS "bec[ame] aware" it was in breach of the Diligent Efforts provision.  If the Trustee *believed* its allegations amounted to a breach, then the CVR Agreement allocated responsibility to the *Trustee* (or to Majority Holders) to provide written notice to BMS "specifying" that default and "requiring it to be remedied."  CVR Agreement § 8.1(b); *see Maverick Tube*, 595 F.3d at 468 (courts must read contract as a whole in construing specific provisions).  The prevention doctrine cannot be used to reallocate that responsibility to BMS.

---

[6] The allegations were different in *Royal Park Invs. S.A./N.V. v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016). An RMBS investor alleged that a trustee, "despite having *discovered*" misrepresentations by loan sellers unknown to investors, did not provide notice of its discovery to its counterparty.  *Id.* at *5 (emphasis added).  The trustee therefore was not permitted to rely on a different requirement, contained in the same provision, under which it only had an obligation to "pursue . . . remedies" for such breaches if the same counterparty instructed it to do so.  *Id.*; *see also id.* at *8 (reaching same conclusion based on allegations of knowledge).

**II.      THE BOOKS AND RECORDS CLAIM ALSO SHOULD BE DISMISSED.**

For the same reason, the Trustee's claim for alleged breach of the Trustee's right to examine books and records also should be dismissed.  The Trustee's other arguments about that claim are equally unavailing.  BMS has not raised "factual issues" by observing that section 4.2(f) does not require the Company to provide records if doing so would "jeopardize any attorney-client privilege" or "contravene any Law or contract[.]"  CVR Agreement § 4.2(f).  Nor does the provision impose an "affirmative obligation" on BMS to permit immediate inspection once it receives a request.  Opp. at 24; *see* CVR Agreement § 4.2(f) (inspection must not "unreasonably interfere" with "normal business operations").

In addition, the complaint does not plausibly allege the purported breach of section 4.2(f) "caused the[] [Trustee] *damages*."  *Bakal v. U.S. Bank, N.A.*, 747 F. App'x 32, 36 (2d Cir. 2019) (emphasis in original) (affirming dismissal).  Nominal damages have not been alleged and therefore are not available.  *Hammond v. Bank of New York Mellon Corp.*, 2010 WL 2643307, at *11 (S.D.N.Y. June 25, 2010).

## CONCLUSION

BMS respectfully submits that the complaint should be dismissed.

Dated:  New York, New York          DLA PIPER LLP (US)
         October 14, 2021

                                        By:  /s/ John J. Clarke, Jr.
                                           John J. Clarke, Jr.
                                           Jessica A. Masella
                                           Jessica Park Wright

                                        1251 Avenue of the Americas
                                        New York, New York  10020-1104
                                        (212) 335-4500

                                        Attorneys for Defendant
                                         Bristol-Myers Squibb Company

13

CERTIFICATE OF SERVICE

The undersigned certifies: that he is a member of the Bar of this Court; that he is counsel for defendant Bristol-Myers Squibb Company in this action; and that on October 14, 2021, he caused the foregoing reply memorandum in further support of the Company's motion to dismiss the complaint to be filed on the docket of this action using the Court's ECF system, which will cause notice of its filing to be served electronically upon all counsel who have appeared in the action

/s/ John J. Clarke, Jr.
John J. Clarke, Jr.

EAST/185198513