UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

UMB BANK, N.A.,                            :
                                           :
                    Plaintiff,         :
                                           :
      v.                                   :        Case No. 1:21-cv-04897 (JMF)
                                           :
BRISTOL-MYERS SQUIBB COMPANY,    :
                                           :
                  Defendant.      :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF BRISTOL-MYERS SQUIBB CO. TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

 

John J. Clarke, Jr.
Jessica A. Masella
Steven M. Rosato
Jessica Park Wright
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company

Dated:  February 2, 2024

Table of Contents

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

    A.    The CVR Agreement and the CVRs........................................................4

    B.    The Liso-cel Application .....................................................................5

    C.    Efforts to Remove Equiniti and Appoint UMB as Trustee.....................................6

    D.    The FDA Does Not Act in Time, and the
           CVR Agreement Terminates..............................................................11

APPLICABLE STANDARD....................................................................................................12

ARGUMENT – THIS ACTION SHOULD BE DISMISSED FOR
               LACK OF SUBJECT MATTER JURISDICTION ...........................................13

    A.    UMB Does Not Have Article III Standing ...........................................14

         1.    Only the Trustee Is Permitted to Sue ........................................15

         2.    UMB Never Became the Trustee ..............................................16

         3.    Other Provisions of the CVR Agreement
             Do Not Alter the Conclusion ....................................................20

    B.    UMB Cannot Establish Subject Matter Jurisdiction
         Through "Equitable Defenses" ..........................................................21

    C.    Lack of Subject Matter Jurisdiction Cannot Be Waived ......................................24

CONCLUSION......................................................................................................................25

Table of Authorities

Page(s)

Cases

*Applestein v. Province of Buenos Aires*,
    415 F.3d 242 (2d Cir. 2005)...................................................19

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*,
    968 F.2d 196 (2d Cir.1992)...................................................13

*Capitol Leasing Co. v. F.D.I.C.*,
    999 F.2d 188 (7th Cir. 1993) ...................................................13

*Carey v. Pennsylvania Enters., Inc.*,
    876 F.2d 333 (3d Cir. 1989)...................................................18

*Corresp. Servs. Corp. v. JVW Inv., Ltd.*,
    2004 WL 2181087 (S.D.N.Y. 2004)........................................ 12-13, 22

*Cortlandt St. Recovery Corp. v. Bonderman*,
    31 N.Y.3d 30 (2018) ................................................. *passim*

*Cortlandt St. Recovery Corp. v. Hellas Telecomm's*,
    790 F.3d 411 (2d Cir. 2015)...................................................14, 20

*Cruden v. Bank of N.Y.*,
    957 F.2d 961 (2d Cir. 1992)...................................................21

*Davis v. Fed. Elec. Comm'n*,
    554 U.S. 724 (2008)...................................................14

*Ex parte McCardle*,
    74 U.S. 506 (1868)...................................................13

*GEOMC Co. Ltd. v. Calmare Therapeutics Inc.*,
    918 F.3d 92 (2d Cir. 2019)...................................................25

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*.
    747 F.3d 44 (2d Cir. 2014)...................................................24

*In re Appraisal of Dell, Inc.*,
    2015 WL 4313206 (Del. Ch. July 30, 2015)...........................................4

*Kamen v. Am. Tel. & Tel.*,
    791 F.2d 1006 (2d Cir. 1986)...................................................13

Page(s)

*Kurz v. Holbrook*,
   989 A.2d 140 (Del. Ch. 2010),
   *aff'd in part, rev'd in part*, 992 A.2d 377 (Del. 2010) ........................................................8, 18

*Law Debenture Tr. Co. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ..................................................................................................21

*Li v. Napolitano*,
   2009 WL 2358621 (S.D.N.Y. July 30, 2009) ......................................................................12

*Lovati v. Petróleos de Venezuela, S.A.*,
   2021 WL 5908953 (S.D.N.Y. Dec. 14, 2021) ......................................................................19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................................12, 14

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
   19 F.4th 58 (2d Cir. 2021) ....................................................................................................14

*Milberg LLP v. HWB Alexandra Strategies Portfolio*,
   2020 WL 3833829 (S.D.N.Y. July 8, 2020) ........................................................................12

*Motorola Corp. v. Uzan*,
   561 F.3d 123 (2d Cir. 2009) ..................................................................................................23

*Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*,
   898 F.3d 243 (2d Cir. 2018) ..........................................................................................15, 16

*Omoniyi v. Dep't of Homeland Sec.*,
   2012 WL 892197 (S.D.N.Y. Mar. 13, 2012) ......................................................................12

*Oscar Gruss & Son Inc. v. Hollander*,
   337 F.3d 186 (2d Cir. 2003) ..................................................................................................19

*Perna v. Health One Credit Union*,
   983 F.3d 258 (6th Cir. 2020) ................................................................................................13

*Phoenix Light SF Ltd. v. U.S. Bank N.A.*,
   612 F. Supp. 263 (S.D.N.Y. 2020),
   *aff'd mem.*, 2021 WL 4515256 (2d Cir. 2021) ..................................................................14

*Precision Instr. Mfg. Co. v. Automotive Maintenance Mach. Co.*,
   324 U.S. 806 (1945) ..............................................................................................................23

*Quadrant Structured Prods. Co. v. Vertin*,
   23 N.Y.3d 549 (2014) ..................................................................................................*passim*

Page(s)

*Quadrant Structured Prods. Co. Ltd. v. Vertin*,
    106 A.3d 992 (Del. 2013) ........................................................22

*Raines v. Byrd*,
    521 U.S. 811 (1997).............................................................1

*Royal Park Invs. S.A./N.V. v. Deutsche Bank Nat'l Tr. Co.*,
    2016 WL 4613390 (S.D.N.Y. Aug. 31, 2016).......................22

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008)....................................................13

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).............................................................13

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).....................................................3, 14, 24

*Trott v. Deutsche Bank AG*,
    2023 WL 6386899 (S.D.N.Y. Sept. 28, 2023).......................25

*United States v. Bond*,
    762 F.3d 255 (2d Cir. 2014)..................................................13

*UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*,
    128 N.Y.S.3d 823 (N.Y. Sup. Ct. 2020) ..................... *passim*

*U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*,
    2004 WL 1699057 (Del. Ch. July 29, 2004)...........................15

Constitution of the United States

Constitution of the United States, Article III, § 2 ................................ *passim*

Statutes and Rules

Fed. R. Civ. P. 12(b)(1)....................................................................12

Fed. R. Civ. P. 12(h)(3)............................................................ 1, 12-13

Fed. R. Civ. P. 17(a)(3)....................................................................20

Fed. R. Civ. P. 43(c) ........................................................................3

Fed. R. Civ. P. 56............................................................................1

Page(s)

### Other Authorities

David Brooks, Comment, *Depository Trust Company and the Omnibus
Proxy: Shareholder Voting in the Era of Share Immobilization*,
56 S. Tex. L. Rev. 205 (2014)...........................................................................................18

Defendant Bristol-Myers Squibb Company ("BMS") respectfully submits this memorandum of law in support of its motion to dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(h)(3).[1]

## PRELIMINARY STATEMENT

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (cleaned up). That core constitutional limitation requires dismissal here.

Plaintiff UMB Bank, N.A. ("UMB") sues solely in its capacity as trustee under the Contingent Value Rights Agreement dated as of November 20, 2019 ("CVR Agreement"), Compl. at 1; *id.* ¶¶ 95, 105, allegedly as successor to Equiniti Trust Company, *id.* § 22. But the evidence shows the purported "act of the Majority Holders" by which UMB allegedly became trustee was not an "act" of the "Holders" of the contingent value rights ("CVRs") at all.

In seeking to remove and replace Equiniti, UMB did not even attempt to obtain an omnibus proxy from The Depository Trust Company ("DTC") – the registered Holder of ███ of the CVRs – or to comply with contractual record date requirements by which Holders entitled to vote are determined. Because of UMB's indisputable failures to comply with the CVR Agreement, the signatures of alleged beneficial owners of CVRs that UMB submitted in its attempt to change the trustee had no legal effect. CVR Agreement § 1.1, § 1.4(a), § 4.10(c). The CVR Agreement does not permit a new trustee to be installed by acclamation.

---

[1] Rule 12(h)(3), as opposed to Rule 56, provides the framework for motions to dismiss an action for lack of subject matter jurisdiction. *See infra* at 11-12.

UMB's failure to comply with the CVR Agreement has consequences.  Because of it, Equiniti was never validly removed as trustee; UMB was never appointed successor trustee, is not authorized to bring this action, and has no injury-in-fact; and this Court does not have subject matter jurisdiction.

The burden rests with UMB, as plaintiff, to establish subject matter jurisdiction by a preponderance of the evidence.  It cannot meet that burden.  UMB suffered no personal injury from the alleged breaches of contract at issue and never obtained standing to sue on behalf of CVR investors.  The CVR Agreement requirements for changing the trustee that UMB failed to follow are clear and unambiguous, and UMB unquestionably did not follow them.  Nor are UMB's substantive failures excused by its putative "acceptance" of its flawed appointment as trustee, which was contained in the same invalid instrument by which it purported to remove Equiniti.  *See* CVR Agreement § 4.11(a).  Allowing this action to proceed when UMB never became the trustee threatens to expose any judgment to collateral attack by disappointed CVR investors contending that UMB never represented them.

UMB has asserted that holding it to the terms of the CVR Agreement would be unfair or "commercially absurd."  ECF No. 65 at 1.  Such appeals to equity are no substitute for evidence. The provisions of the CVR Agreement are dispositive and make it clear that UMB does not have authority to sue.  *UMB Bank, N.A. v. Neiman Marcus Grp. Inc.*, 68 Misc. 3d 977, 981-82 (N.Y. Sup. Ct. 2020) (dismissing fraudulent conveyance action based on "dispositive" terms of bond indenture; rejecting arguments based on "general notions of equity"); *see Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 40 (2018) ("to determine the trustee's authority to pursue the causes of action in the appeal before us, we look to the language of the indenture"). Further, UMB cannot invoke the Court's equitable jurisdiction given its own willingness to

███████████████████████████████████████████████████

██████████████████████████████████████████ in violation of provisions

of the CVR Agreement requiring any litigation recovery to be distributed ratably.

Finally, UMB's acquiescence and waiver arguments are also unavailing.  When BMS signed a notice to CVR Holders that there had been a change of trustees by an "act of the Majority Holders," it did not know about UMB's failures to follow the CVR Agreement.  But even if it had known, the CVR Agreement did not empower BMS or Equiniti to consent to a change in trustees as an "act" of Majority Holders when it so obviously was not one.  CVR Agreement § 4.10 (articulating specific methods for change in trustee), § 6.1(e) (prohibiting amendments to CVR Agreement that "adversely affect the interest of Holders").  Nor has BMS waived the issue during this litigation.  BMS included UMB's lack of capacity to sue as a defense in its answer, ECF No. 35, 2d Defense, and lack of subject matter jurisdiction cannot be waived in any event.

Injury-in-fact is an indispensable jurisdictional requirement; without it, there is no "case or controversy" within the meaning of Article III.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Because UMB does not, and cannot, satisfy this essential jurisdictional requirement, the action must be dismissed.  Fed. R. Civ. P. 12(h)(3).  If there are unresolved questions of fact concerning the Court's subject matter jurisdiction, the Court should schedule an evidentiary hearing to determine them.  Fed. R. Civ. P. 43(c).  Any question about subject matter jurisdiction must be resolved before the merits can be addressed.

## STATEMENT OF FACTS[2]

### A.      The CVR Agreement and the CVRs

On January 3, 2019, BMS and Celgene announced they had entered into a merger agreement under which BMS would acquire Celgene for consideration consisting of $50 in cash, one share of BMS common stock, and one CVR for each share of Celgene common stock.  Compl. ¶ 36.  Each CVR would provide holders a contingent right to receive $9 in cash, but only if the FDA approved applications for three new products on or before agreed upon milestone dates.  One of these was the application for liso-cel, a novel cell therapy for treatment of lymphoma, which needed to be approved by December 31, 2020.  *Id.* ¶¶ 3, 31, 39.  The FDA was not bound by these contractual deadlines.

After a lengthy regulatory review, the merger closed on November 20, 2019, and BMS entered into the CVR Agreement with Equiniti, as trustee, on the same date.  *Id.* ¶ 38.  The CVRs began trading on the New York Stock Exchange.  As registered securities traded on a national exchange, the CVRs were subject to the book-entry securities trading system administered by DTC.  *See In re Appraisal of Dell, Inc.*, 2015 WL 4313206 at *4-7 (Del. Ch. July 30, 2015) (detailing DTC system and its history).  Under that system, the "Security Register" maintained by Equiniti listed DTC, through its nominee Cede & Co., as the registered "Holder" for all of the exchange-traded CVRs.  CVR Agreement § 3.2 (Registrable Form), § 3.5 (Registration).  As of December 31, 2020, the CVRs for which DTC was the registered Holder accounted for more than 99.9% of all of the CVRs then outstanding.  *See infra* at 16 & n.8.

---

[2] The facts have been developed in discovery and, in many instances, were not available to BMS at the time.  Citations to "Exh." refer to exhibits to the accompanying declaration of John J. Clarke, Jr. dated February 2, 2024.  For ease of reference, a copy of the CVR Agreement is submitted as Exhibit 1.  Excerpts from cited deposition transcripts are attached as Exhibits 2, 3, 4, & 5.

###### B.    The Liso-cel Application

The last component of the liso-cel application was filed with the FDA on December 18, 2019, several weeks after the closing of the Celgene merger.  Compl. ¶ 46.  On February 13, 2020, BMS announced that the FDA had accepted the application and designated it for Priority Review, meaning the FDA's action date would be August 17, 2020, under the Prescription Drug User Fee Act of 1995, as amended ("PDUFA").  Compl. ¶ 50.

On January 31, 2020, the U.S. Department of Health and Human Services declared a public health emergency in response to the emergence of COVID-19 in the United States.  In March, the pandemic was deemed to be a national emergency and the FDA curtailed operations in response, including by significantly reducing the number of facility inspections to be conducted by FDA staff.  *See* FDA Statement, "Coronavirus (COVID-19) Update: FDA Focuses on Safety of Regulated Products While Scaling Back Domestic Inspections," Mar. 18, 2020.

On May 6, 2020, BMS announced that the FDA had extended the PDUFA action date for liso-cel by three months, until November 16, 2020, because the agency had deemed additional information submitted by BMS in response to a request made after the FDA accepted the application to constitute a major amendment.  Exh. 6; Compl. ¶ 53.

On November 5, 2020, shortly before the new PDUFA date for liso-cel, BMS reported that the FDA would require in-person inspections of two manufacturing facilities used in the production of liso-cel before it could issue a decision on the application and that one of the two inspections had not yet been scheduled (while the FDA already had completed the other one).  Exh. 7.  On November 16, 2020, the liso-cel PDUFA date, BMS reported that the FDA was "deferring action on the [liso-cel] application" because the agency still had not been able to inspect

the second manufacturing facility "due to travel restrictions related to the COVID-19 pandemic[.]" Exh. 8.

### C.    Efforts to Remove Equiniti and Appoint UMB as Trustee

In the wake of these reports, UMB and several CVR investors began discussing █

████████████████████████████████. Pentwater Dep. 98:17-22, 106:14-107:11. UMB is experienced in bringing suits against issuers as an indenture trustee at the behest of investors. UMB Dep. 25:6-22; Pentwater Dep. 87:20-88:1, 108:25-109:3; Equiniti Dep. 36:19-24. In late 2019, for example, UMB negotiated a settlement of a lawsuit against Sanofi in which it alleged that Sanofi failed to use "Diligent Efforts" to meet the conditions to payment for a series of CVRs issued in its merger with Genzyme. The investment funds that financed the litigation received a 750% return on their investment from the settlement.[3]

After initially suggesting, unsuccessfully, that Equiniti step aside to permit UMB to be appointed trustee, ████████████████████████████████████████ which would require an "act of the Majority Holders." Pentwater Dep. 96:22-97:1; Equiniti Dep. 42:19-43:18; *see* CVR Agreement §§ 4.10(c), (e). By December 3, 2020, however, UMB only had collected support from beneficial owners of one-third of the CVRs – far less than the majority needed. Exh. 10.

A week later, UMB still did not have enough support. On December 9, 2020, an investment manager with a large CVR position, Pentwater Capital Management LP, issued a press release seeking signatures from CVR investors in support of the change in trustee. The Pentwater press

---

[3] Investors who financed the Sanofi lawsuit recovered $71.64 million in return for their investment of $8.4 million in the litigation. Of the $316.2 million gross settlement amount, only $209.78 million was left for CVR investors after paying those financiers, UMB's own fees, and the lawyers who pursued the case. Exh. 9.

release stated that "[t]he trustee is a very important party to this agreement, as some actions that you may want to pursue as a holder of the CVR must be done through the trustee."  It emphasized that "[t]ime [was] of the essence," because the liso-cel milestone date was "only weeks away."[4] Contact information was provided for both UMB and Okapi Partners LLC, a proxy solicitation firm.  Exh. 11.

The parties seeking to install UMB seemingly failed to review the requirements of the CVR Agreement for doing so.  The agreement specifies that only registered Holders, or their "agent duly appointed in writing," are empowered to act and only Holders on the "record date" (which is defined in the same section) can take action "without a meeting" by "vote or consent." CVR Agreement § 1.4(a).  Before the press release went out, Okapi ███████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████  Exh. 12; Okapi Dep. 67:2-68:22.  Okapi's representative confirmed in his deposition that █████████████████████████████████████████████████ Okapi Dep. 16:25- 17:6;  71:20-23.   Instead, ████████████████████████████████████████ ███████████████████████████████████████████████  *Id.* 52:18-21, 55:17-23, 63:7-9, 119:23-120:2; 142:10-20.

████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████  UMB Dep.  19:7-12, 161:22-24;  Equiniti Dep.  27:16-21, 69:5-12;  Pentwater Dep. 35:8-11, 35:24-36:5; Okapi Dep. 19:7-22, 25:10-12. ███████████████████████

---

[4] If the FDA did not approve the liso-cel application by its milestone date, the CVR Agreement would terminate automatically.  CVR Agreement § 1.16.



████████████████████████████████████████████████████

████████████████████████████ UMB Dep. 100:8-19; Equiniti Dep. 26:12-25; 100:15-17,

167:9-20; Okapi Dep. 24:1-13, 25:10-12. ████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████[5] Okapi Dep. 30:6-12.  Okapi's representative testified that

███████████████████████████████████████████████████. Okapi Dep.

56:13-16, 103:11-22.

 As a result of the rushed, informal, and non-compliant process, Okapi received a number

of questions about it after Pentwater's press release went out.  One institutional investor asked

█████████████████████████████████████████████. When Okapi advised that

████████████████████████████████████████, the investor ████████████████

████████████████████████████████████████████████████

███████████████████. Exh. 13. ███████████████████████████████████. Okapi

Dep. 108:3-114:6.

 In another email, a representative of JP Morgan Chase asked ████████████████████

████████████████████████████████████████████████████

███████████ Exh. 14. ██████████████████████████ Okapi Dep. 123:10-12.  In an

internal email following a similar question from Morgan Stanley, a senior Okapi officer explained

---

 [5] Since 2007, Broadridge has managed proxy processing services on behalf of most of the
banks and brokers that are participants in DTC.  In a solicitation, Broadridge delivers proxy
statements and voting instruction forms to those participants' customers who are beneficial
owners, collects their voting instructions, and then submits an omnibus proxy to vote on behalf of
Broadridge's clients, the banks and brokers, based on the voting instructions received from the
beneficial owners.  *See Kurz v. Holbrook*, 989 A.2d 140, 148 (Del. Ch. 2010), *aff'd in part, rev'd
in part*, 992 A.2d 377 (Del. 2010).

███████████████████████████████████████████████

████████████████████████ Exh. 15.

On December 17, 2020, DTC itself reached out.  In an email to Okapi on that date, a DTC employee asked "if there is a consent solicitation notice . . . that DTC should be receiving?"  As DTC explained, if DTC action were needed the parties would need to meet its requirements:

- "All consent material must be on the letterhead of the party soliciting the consent
- Material must contain CUSIP numbers
- ***A record date must be established for holders eligible to consent***
- A expiration date (if applicable)
- Details of any consent fee (if applicable)
- Who will act as information agent (for questions or materials)
- Who will act as Consent tabulation agent
- All consent material should be directed to consentannouncements@dtcc.com
- All consent solicitation material must be dated"

Exh. 16 (emphasis added).  The ongoing effort to replace Equiniti did not meet most of these DTC requirements, including because there was no record date.  Okapi concluded ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Okapi Dep. 143:15-144:14; *see* Exh. 16.

UMB did not change its approach (or inform BMS about any of the irregularities in its process).  On the evening of Friday, December 18, 2020, the day after the DTC email, UMB sent a letter to BMS and Equiniti asserting that Equiniti had been removed, and UMB had been appointed, by "the Holders of not less than 50% of the CVRs Outstanding[.]"  The letter enclosed an "Instrument of Removal, Appointment and Acceptance" that UMB asserted had been signed by "Majority Holders."  The materials did not include any omnibus proxy from DTC █████████

UMB Dep. 166:13-22, 175:15-20.  Nor did the package include evidence that the Instrument's signatories even owned the CVRs they claimed.  Exh. 17.

In an email to Equiniti on the morning of Tuesday, December 22, 2020, an in-house lawyer from BMS asked: "Can you please confirm if UMB did in fact get the required 50% of CVR holders for the trustee change?"  An Equiniti relationship manager responded:

> None of the shareholders (*sic*) are registered holders, with that being said I cannot verify the shareholders or the number of shares each holds.  Based on the number of shares indicated on the form, the total does exceed 50% of outstanding shares.

The BMS lawyer then asked Equiniti's general counsel, David Becker, if what UMB had delivered was "sufficient proof of the holders or can we request additional proof of ownership from UMB?"  Exh. 18.  In a follow up email, she explained that BMS "wanted to ensure that the appropriate due diligence was carried out to avoid any future challenge by any holder to the change in Trustee."  *Id.*

In an email to UMB the next day, Equiniti asked UMB ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ Gavin Wilkinson of UMB ████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ Exh. 20.

UMB ultimately chose the first option – to ignore Equiniti's request.  Exh. 19.  Meanwhile, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ Despite Equiniti's request ████████████████████████████████████████████████████

███████████████████████████████████ UMB Dep. 100:8-19; Pentwater Dep. 38:23-39:3; Okapi Dep. 24:1-8, 25:10-12, 44:15-45:7; Equiniti Dep. 136:19-23, 167:13-20.

On the afternoon of December 31, 2020, ██████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████ Exhs. 21, 22. The materials included ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████

In an email to Equiniti that afternoon, BMS said it would look to Equiniti, as the current trustee, "for final confirmation regarding the majority ownership needed to change the Trustee." The email said that if Equiniti "was comfortable moving forward," then BMS would provide "sign-off" for a notice to holders. Exh. 23.

Equiniti was not interested in having a dispute about whether it had been removed. It looked over the bank account information included with the December 31, 2020, letter and concluded that enough beneficial owners had signed to effectuate a change in trustees. Equiniti Dep. 83:17, 148:20-149:7, 166:17-167:8. But in doing so, Equiniti operated under the mistaken belief that consents from beneficial owners alone could suffice. Equiniti Dep. 200:22-203:8. Equiniti could not recall having any discussion with UMB (or with BMS) about a DTC omnibus proxy. Equiniti Dep. 136:10-23.

### D.    The FDA Does Not Act in Time, and the CVR Agreement Terminates

In a press release on January 1, 2021, BMS reported that the FDA had not acted on the

liso-cel application by the milestone date and the CVR Agreement therefore "automatically terminated in accordance with its terms[.]" Compl. ¶ 79. On January 4, 2021, Equiniti distributed a notice to holders reporting that "holders of not less than 50% of the outstanding CVRs have removed the Trustee, Equiniti Trust Company, and appointed a successor Trustee, UMB Bank, National Association." The notice was signed by BMS. Exh. 24.

## APPLICABLE STANDARD

Under Federal Rule 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, [it] must dismiss the action." Fed. R. Civ. P. 12(h)(3). "Motions brought pursuant to Rule 12(h)(3) are subject to the same standards as motions to dismiss for lack of subject-matter jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(1), except that the former may be asserted at any time and need not be responsive to a pleading." *Omoniyi v. Dep't of Homeland Sec.*, 2012 WL 892197, at *4 (S.D.N.Y. Mar. 13, 2012) (citing *Corresp. Servs. Corp. v. JVW Inv., Ltd.*, 2004 WL 2181087, at *5 (S.D.N.Y. 2004)).

"On a motion to dismiss for lack of subject matter jurisdiction, the court must accept the material factual allegations contained in the complaint." *Corresp. Servs. Corp.* 2012 WL 892197, at *4 (citation omitted). "Nonetheless, the court may resolve disputed jurisdictional factual issues by reference to evidence outside the pleadings." *Id.*; *see Li v. Napolitano*, 2009 WL 2358621, at *1 (S.D.N.Y. July 30, 2009) ("[W]here jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony to determine whether jurisdiction exists.").

"The party invoking federal jurisdiction bears the burden of establishing that jurisdiction exists." *Milberg LLP v. HWB Alexandra Strategies Portfolio*, 2020 WL 3833829, at *2 (S.D.N.Y. July 8, 2020) (citation omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). It

"must *prove* that the court has such jurisdiction by a preponderance of the evidence." *Corresp. Servs. Corp.*, 2004 WL 2181087, at *6 (emphasis added); *see TransUnion*, 594 U.S. at 430-31 ("As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."). In determining the question, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (citation omitted). Nor can a plaintiff satisfy its burden through favorable pleading inferences. *Milberg*, 2020 3833829, at *2; *see Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992) ("[A]rgumentative inferences favorable to the party asserting jurisdiction should not be drawn.")

Even though evidence can be considered, a motion to dismiss for lack of subject matter jurisdiction "cannot be converted into a Rule 56 motion." *Kamen v. Am. Tel. & Tel.*, 791 F.2d 1006, 1011 (2d Cir. 1986). A motion for summary judgment seeks a ruling on the merits, but when a court does not have subject matter jurisdiction it "must dismiss the case without ever reaching the merits[.]" *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (*per curiam*); *see also Perna v. Health One Credit Union*, 983 F.3d 258, 273-74 (6th Cir. 2020) (same).

## ARGUMENT

### THIS ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

"Subject matter jurisdiction is a 'threshold question that must be resolved . . . before proceeding to the merits.'" *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (citation omitted). "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

"For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." *TransUnion*, 594 U.S. at 423 (quoting *Raines*, 521 U.S. at 819). "Article III standing requires plaintiffs to show (1) an 'injury in fact,' (2) a 'causal connection' between that injury and the conduct at issue, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021) (quoting *Lujan*, 504 U.S. at 560-61); *see Cortlandt St. Recovery Corp. v. Hellas Telecomm's*, 790 F.3d 411, 417 (2d Cir. 2015) (affirming subject matter dismissal where plaintiff had not "carried its burden of showing a valid assignment of a claim").

During a case, the standing inquiry "remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008); *see, e.g.*, *Phoenix Light SF Ltd. v. U.S. Bank N.A.*, 612 F. Supp. 263, 282 (S.D.N.Y. 2020) (concluding after discovery that plaintiffs lacked Article III standing because assignment of underlying claim was void as champertous), *aff'd mem.*, 2021 WL 4515256 (2d Cir. 2021).

### A.   UMB Does Not Have Article III Standing.

In this case, UMB has not suffered the required injury-in-fact. The Court therefore does not have subject matter jurisdiction. "'[T]he minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim.'" *Cortlandt St.*, 790 F.3d at 420 (citation omitted).

UMB was not ████████████████ and does not allege it suffered direct injury. *See* UMB Dep. 91:16-19. Instead, UMB brought this action "solely in its capacity as Trustee" under the CVR Agreement. Compl. at 1; *see id.* ¶¶ 95, 105. The complaint alleges that UMB succeeded Equiniti on December 18, 2020 "as Trustee of an express trust for the benefit of the holders of CVRs under the CVR Agreement." *Id.* § 22. Those allegations are legal conclusions, not facts.

14

*Sharkey*, 541 F.3d at 83.  They also conflict with the evidence, which demonstrates that Equiniti was not removed, and UMB was not appointed, as trustee.  UMB therefore does not have, and never had, either a "proprietary interest in" or "legal title to" the claims it is asserting. *Cortlandt St.*, 790 F.3d at 420.

### 1.    *Only the Trustee Is Permitted to Sue.*

"An indenture is essentially a written agreement that bestows legal title of the securities in a single [t]rustee to protect the interests of individual investors who may be numerous or unknown to each other."  *Bonderman*, 31 N.Y.3d at 39 (quoting *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 23 N.Y.3d 549, 555 (2014)).

As a "stakeholder," the duties and obligations of an indenture trustee "'are exclusively defined by the terms of the indenture.'"  *UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*, 68 Misc. 3d at 981-82 (quoting *Bonderman*, 31 N.Y.3d at 39); *see Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*, 898 F.3d 243, 253-55 (2d Cir. 2018) (indenture provisions barred plaintiffs' standing; only indenture trustees could assert claims at issue); *U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057 at *2-3 (Del. Ch. July 29, 2004) (dismissing claim for lack of standing based on trustee's failure to comply with indenture conditions prior to suit) (applying New York law).

The indenture in this case is the CVR Agreement.  It provides that only "the Trustee" can sue for alleged "Events of Default" such as those UMB has asserted against BMS. CVR Agreement § 8.1 ("If an Event of Default described above occurs and is continuing . . . the Trustee . . . shall bring suit to protect the rights of the Holders . . ."); *see also id.* § 8.4 ("In case an Event of Default has occurred . . . the Trustee may . . . enforce its rights and the rights of the Holders under this CVR Agreement by such appropriate judicial proceedings as the Trustee shall deem most effectual . . .").  Holders generally are barred from suing.  CVR Agreement, § 8.6.

These limitations are customary. They "make[] it more difficult for individual [securityholders] to bring suits" when the majority might be opposed and, importantly in this case, "ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all [holders]." *Bonderman*, 31 N.Y.3d at 43-44 (quoting *Quadrant Structured Prods.*, 23 N.Y.3d at 566).

### 2. *UMB Never Became the Trustee.*

The unambiguous provisions of the CVR Agreement also control in determining whether Equiniti was removed as trustee and UMB was appointed as its successor. *Bonderman*, 31 N.Y.3d at 39 ("we construe an indenture subject to the rule that 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms'") (quoting *Quadrant Structured Prods.*, 23 N.Y.3d at 559-60); *see Nat'l Credit Union Admin. Bd.*, 898 F.3d at 255 ("New York law requires that we give effect to the plain meaning of the Indenture Agreements' unambiguous terms"); *UMB Bank N.A. v. Neiman Marcus Grp. Inc.*, 68 Misc. 3d at 983-984 ("These are sophisticated parties engaged in a sophisticated commercial transaction . . . . Their contracts must be enforced in the most predictable manner consistent with their clear terms."). The evidence shows UMB did not comply with the requirements of the CVR Agreement.

Section 4.10 of the CVR Agreement provides several methods for removing the indenture trustee, but UMB proceeded *only* pursuant to section 4.10(c), which provides: "The Trustee may be removed at any time by *an act of the Majority Holders*, delivered to the Trustee and to the Company." CVR Agreement § 4.10(c) (emphasis added).[6] When the trustee has been removed,

---

[6] Section 4.10(b) permits "the Trustee" to resign at any time (with certain limitations), and section 4.10(d) provides for its automatic removal in some circumstances. *See* CVR Agreement § 4.10. Neither was invoked in this case.

section 4.10(e) permits a successor trustee to be appointed "by act of the Majority Holders delivered to the Company and the retiring Trustee" (among other methods).  *Id.* § 4.10(e).

Under the CVR Agreement, "Holder" means "a Person in whose name a Security is registered in the Security Register," and "Majority Holders" means "Holders of at least a majority of the Outstanding CVRs."  CVR Agreement § 1.1.  Beneficial owners of CVRs are not listed in the Security Register and are not Holders.  *See* CVR Agreement § 3.5(b)(ii) ("The transfer and exchange of beneficial interests in the Global Securities will be effected through the Depositary, in accordance with the provisions of this CVR Agreement and the Applicable Procedures.").[7]

The registered Holder was Cede & Co., as DTC's nominee, for *all* of the CVRs that were traded on the NYSE.  As of December 31, 2020, Cede & Co. was the Holder ███████████ ████  Exh. 25.  *None* of the alleged beneficial owners of CVRs who provided signatures for the Instrument was listed in the Security Register.  Exh. 18; Equiniti Dep. 161:7-14.  As a result, *none* of those signatories was a Holder.

Section 1.4 of the CVR Agreement governs "Acts of Holders."[8]  UMB did not comply with its requirements in a number of ways.  It did not obtain, or even attempt to obtain, an omnibus

---

[7] ████████████████████████████████████████████████
Exh. 25.  ████████████████████  CVRs held by BMS as treasury securities are not counted.
*See* CVR Agreement § 1.1 (definition of "Outstanding").

[8] Section 1.4(a) provides, in pertinent part:

> Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this CVR Agreement to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor *signed by such Holders in person or by an agent duly appointed in writing*; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments.  . . .  The Company may set a record date for purposes of

proxy from DTC, which was the way Cede & Co., as registered Holder, would "duly appoint" its

agent "in writing" for the purpose of taking action. 

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████. *Kurz*, 989 A.2d at 147-48; *see Carey v. Pennsylvania*

*Enters., Inc.*, 876 F.2d 333, 341 (3d Cir. 1989) (beneficial owners who did not have proxy from

Cede & Co. "were not entitled to vote those shares"); *see generally* David Brooks, Comment,

*Depository Trust Company and the Omnibus Proxy: Shareholder Voting in the Era of Share*

*Immobilization*, 56 S. Tex. L. Rev. 205, 221-27 (2014) (describing stockholder voting in current

system of indirect ownership).   In addition, no one asked BMS to set a record date (and the

Pentwater press release did not mention one).

　　　When UMB delivered the Instrument to BMS and Equiniti on December 18, 2020, it

misleadingly asserted the document reflected an action of "the Holders of not less than 50% of the

CVRs Outstanding" to remove Equiniti as trustee and appoint UMB as its replacement pursuant

to sections 4.10(c) and (e) of the CVR Agreement.  Exh. 17.  Equiniti quickly confirmed for BMS

that the signatories were not registered Holders.  Exh. 18.  But UMB did not disclose, and neither

Equiniti nor BMS knew, that UMB had not obtained, *or even attempted to obtain*, proxies from

---

　　　　determining the identity of Holders entitled to vote or consent to any action by vote or
consent authorized or permitted under this CVR Agreement.  If not previously set by the
Company, . . . (ii) ***the record date for determining the Holders entitled to consent to any***
***action in writing without a meeting shall be the first date on which a signed written***
***consent setting forth the action taken or proposed to be taken is delivered*** to the
Company. ***If a record date is fixed, those Persons who were Holders of Securities at such***
***record date (or their duly designated proxies), and only those Persons, shall be entitled***
***to take such action*** by vote or consent . . . .

CVR Agreement § 1.4(a) (emphasis added).

DTC and Broadridge needed for the signatures of those beneficial owners to actually constitute an "act of the Majority Holders."

Similarly, UMB represented in the Instrument that the counterparts attached to that document showed the signatories' ownership of CVRs "as of December 9, 2020," which it later defined as the "Record Date." Exhs. 17, 21. But because BMS was never asked to set a record date, the record date would be "the first date on which a signed written consent" was delivered to BMS. CVR Agreement § 1.4(a); *see* UMB Dep. 19:7-20:23. Even if consents by beneficial owners, rather than Holders, might set a record date under this provision, UMB never even attempted to show that there had been an "act of the Majority Holders" as of December 18, 2020 when the first signature ever was delivered to BMS.[9]

"[A]n action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." *Oscar Gruss & Son Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003) (citation omitted).[10] UMB never has been entitled to enforce the CVR Agreement because it never became "the Trustee." CVR Agreement §§ 8.1, 8.4. Unless this action is dismissed, BMS is exposed to the risk of collateral attack on any judgment it might obtain against UMB by disappointed CVR investors based on UMB's lack of capacity to bring this suit. *See*

---

[9] UMB contorts the plain words used in section 1.4(a) in asserting that no record date was required for its effort to change trustees. ECF No. 65 at 4. That section requires a record date for "any action in writing without a meeting," regardless of whether the "action" is called a "request," a "demand," a "consent," or something else. CVR Agreement § 1.4(a).

[10] UMB's lack of standing is constitutional, not prudential, because UMB has no basis to assert its claims other than as an alleged stakeholder. This case therefore is distinguishable from *Applestein v. Province of Buenos Aires*, 415 F.3d 242 (2d Cir. 2005), and other cases where the failure to obtain DTC permission to sue under an indenture's "negating clause" could be cured after a suit was filed without affecting subject matter jurisdiction. *See Lovati v. Petróleos de Venezuela, S.A.*, 2021 WL 5908953 (S.D.N.Y. Dec. 14, 2021) (discussing distinction).

*Cortlandt St.*, 790 F.3d at 421 ("real party in interest" rule ensures "that the judgment will have its proper effect as res judicata").

Moreover, because UMB never had the capacity to assert its claims against BMS, dismissal is required even if the defects in its standing somehow could be cured. *Id.* at 422 (citation omitted). This lawsuit is "a nullity," meaning there is no federal action that the real party in interest could "ratify, join, or be substituted into under Rule 17(a)(3) or otherwise." *Id.* at 423.

### 3.    *Other Provisions of the CVR Agreement Do Not Alter the Conclusion.*

In a previous submission, UMB asserted that other provisions in the CVR Agreement "provide[d] closure" on the alleged change of trustee under section 4.10(c) and (e) of the CVR Agreement, even though UMB admittedly did not comply with the requirements for changing the trustee by an "act of the Majority Holders." ECF No. 65 at 3. Those contract-based arguments are mistaken.

*First*, Equiniti did not have the power to excuse UMB's failures to comply with the CVR Agreement by "exercis[ing] its responsibility to determine that the Instrument removing Equiniti and appointing UMB was 'sufficient,'" as UMB has argued. *Id.* Section 1.4(b) provides that: "The **fact** and **date** of the **execution** by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient." CVR Agreement § 1.4(b) (emphasis added). However, the "fact and date of the execution" of the Instrument are not the deficiencies that deprive UMB of standing.

Section 1.4(c) makes clear that: "The **ownership** of Securities shall be **proved by the Security Register**," and "[n]either the Company nor the Trustee . . . shall be affected by any notice to the contrary." *Id.* § 1.4(c) (emphasis added). In this case, there is no dispute that Cede & Co. is the only relevant Holder listed in the Security Register and that Cede & Co. did not provide its consent or proxy for the change in trustee. Equiniti did not have authority to disregard that fact.

20

*Second*, UMB's purported "acceptance" of its appointment as successor trustee in the same defective Instrument in which it purportedly was appointed also does not excuse its failure to comply with the CVR Agreement.  ECF No. 65 at 3 (citing CVR Agreement § 4.11(a)).  Under section 4.11(a), a "successor Trustee appointed hereunder" automatically becomes "vested with all rights, powers, trusts and duties" of the "retiring Trustee" when it delivers "an instrument accepting such appointment."   CVR Agreement § 4.11(a).   UMB purported to provide its acceptance in the Instrument delivered on December 18, 2020.  *See* Exh. 17.  But UMB had not been "appointed" the successor trustee by then, as section 4.11(a) contemplates, because the Instrument was not an "act of the Majority Holders" under sections 4.10(c) and (e).  UMB's "acceptance" was just another invalid act.

### B.  UMB Cannot Establish Subject Matter Jurisdiction Through "Equitable Defenses."

Confronted with this record showing it did not comply with the CVR Agreement to become trustee, UMB contends that dismissing this action based on a "technicality" would "create a commercially absurd precedent," that would "upset . . . settled market expectations," ECF No. 65 at 1, and should be denied based on "equitable defenses such as ratification, estoppel, and acquiescence," *id.* at 5.  UMB is wrong for several reasons.

*First*, UMB's standing, or lack of standing, must be determined based on the unambiguous terms of the CVR Agreement.  *Bonderman*, 31 N.Y.3d at 39.  The Court is not permitted to "redraft" the agreement "to accord with its instinct for the disposition of equity upon the facts of a given case."  *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992); *see also Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (court is "not free to alter" an unambiguous agreement "to reflect its personal notions of fairness and equity").

"Settled market expectations," to the extent considered, would be upset far more by allowing this case to proceed in spite of UMB's failures to comply with the CVR Agreement than they would be by dismissing it due to those failures. *See Quadrant Structured Prods. Co. Ltd. v. Vertin*, 106 A.3d 992, 997 (Del. 2013) ("An important requirement for public debt security markets is that the rights pertaining to those securities be certain and predictable to both investors and issuers.") (certifying indenture issue to New York Court of Appeals); *UMB Bank, N.A. v. Neiman Marcus*, 68 Misc. 3d at 984 (any "negative market consequences" arising from construction of indenture that forbade trustee suit "can be easily remedied" in future drafting).

*Second*, it is UMB's burden to "*prove* that the court has [subject matter] jurisdiction by a preponderance of the evidence." *Corresp. Servs. Corp.*, 2004 WL 2181087, *6 (emphasis added). UMB cannot meet that burden through "equitable defenses." ECF No. 65 at 5. Further, BMS did not have authority under the CVR Agreement to "ratify" or "acquiesce" in the removal of Equiniti and appointment of UMB given its failures to comply with the agreement's requirements, even if BMS had known about them.

The CVR Agreement prohibits BMS and "the Trustee" from agreeing to modify its terms in any manner that would "adversely affect the interests of the Holders." *See* CVR Agreement § 6.1(e). Permitting removal of the trustee by an "act of the beneficial owners," without obtaining written authority of Holders, would violate that limitation. *See Royal Park Investments S.A./N.V. v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 4613390, at *16 (S.D.N.Y. Aug. 31, 2016) ("Ratification, under New York law, requires both 'knowledge of a defect in the act to be confirmed' and 'the right to reject or ratify it.'") (citation omitted).

*Finally*, even if equitable defenses were permitted in these circumstances (which they are not), UMB is precluded from invoking this Court's equitable power under the doctrine of unclean

hands.  That doctrine "'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'"  *Motorola Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (quoting *Precision Instr. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945)).  UMB is subject to the doctrine given its conduct in matters directly relating to its alleged equitable defenses.

UMB repeatedly represented that its submissions to BMS and Equiniti represented an "act of the Majority Holders," when UMB knew or should have known that they did not.  In addition, soon after "accepting" its appointment, UMB ███████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████ *See* Exh. 26. ████████████████████████

██████████████████████████████████████████████

██████████████████████████ *See id.* § 3.2 (Payment Waterfall).

In addition to ██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ *Id.* § 1.1 (definition of "Success Fee").  ████

██████████████████████████████████████████████

██████████████████████████████ These provisions clearly violate the CVR Agreement, which mandates that litigation recoveries be distributed to Holders ratably without "priority or preference."  *See* CVR Agreement § 8.2 (proceedings instituted by trustee "shall be for the ratable benefit of the Holders"); § 8.3 (proceeds of litigation to be distributed "ratably" if less than amounts owing and unpaid); § 8.6 (no Holders "may obtain or seek to obtain priority or preference over any other of such Holders or to enforce any right under this CVR Agreement, except for the

equal and ratable benefit of all such Holders").  Protecting against such an abuse is one reason the CVR Agreement requires an "act of the Majority Holders" to change the trustee.  *See Vertin*, 23 N.Y.3d at 566 (discussing policy as reason for "no action" clauses).



Given UMB's willingness to disregard the CVR Agreement at the expense of the Holders, it cannot now invoke this Court's equitable jurisdiction to avoid the consequences of its failure to comply with the same agreement.

### C.  Lack of Subject Matter Jurisdiction Cannot Be Waived.

Finally, BMS has not waived its standing defense, as UMB also mistakenly asserts. ECF No. 65 at 2.  *First*, a lack of subject matter jurisdiction cannot be waived. *Bond*, 762 F.3d at 263; *see* Fed. R. Civ. P. 12(h)(3).  Nor is UMB's lack of capacity a failure of "prudential," instead of constitutional standing.  A plaintiff without injury-in-fact, such as UMB here, does not have constitutional standing.  *TransUnion*, 594 U.S. at 423; *see Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 49-50 (2d Cir. 2014) (plaintiff landlord lacked prudential, not constitutional standing, because it had suffered harm from repudiation of lease but did not have right to sue under FDIC agreement by which lease was repudiated).

*Second*, BMS's answer expressly included the defense.  *See* Answer, 2d Defense ("UMB Bank, N.A. lacks the capacity to sue BMS for breach of the CVR Agreement.").  The defense did not specifically articulate UMB's failure to obtain omnibus proxies from DTC and

24

Broadridge as reasons, but BMS did not know those facts until long after it filed its answer.  The defense was pleaded with more than sufficient specificity to place UMB on notice that its lack of capacity was in dispute.  *See GEOMC Co. Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019) ("degree of rigor" in pleading affirmative defenses is context-specific and may be less demanding than the one applied to complaint).  BMS "is entitled to a full opportunity to assert" its standing defense "and have it adjudicated before a plaintiff may impose liability."  *Id.* at 98; *see Trott v. Deutsche Bank AG*, 2023 WL 6386899 at *6 (S.D.N.Y. Sept. 28, 2023) (denying motion to strike affirmative defense).

## CONCLUSION

For the foregoing reasons, BMS respectfully requests that the Court dismiss this action for lack of subject matter jurisdiction and grant BMS such other relief as it may deem just and proper.

Dated: New York, New York  
       February 2, 2024

DLA PIPER LLP (US)

By:   /s/ John J. Clarke, Jr.                 
     John J. Clarke, Jr.  
     Jessica A. Masella  
     Steven M. Rosato  
     Jessica Park Wright

1251 Avenue of the Americas  
New York, New York  10020-1104  
(212) 335-4500

Attorneys for Defendant  
 Bristol-Myers Squibb Company