UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x
: 
UMB BANK, N.A., :
:
                Plaintiff, :
:
      v. : Case No. 1:21-cv-04897 (JMF)
:
BRISTOL-MYERS SQUIBB COMPANY, :
:
                Defendant. :
:
------------------------------------------- x

# REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS
# FOR LACK OF SUBJECT MATTER JURISDICTION

 

John J. Clarke, Jr.
Jessica A. Masella
Steven M. Rosato
Jessica Park Wright
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company

Dated: April 5, 2024

Table of Contents

Page

I. INTRODUCTION ..................................................................................................................1

II. THE ACTION SHOULD BE DISMISSED FOR LACK OF JURISDICTION .................2

    A. The Plain Language of the CVR Agreement Requires Dismissal ...........................2

    B. Waiver Doctrines Cannot Prevent Dismissal............................................................5

    C. BMS Appropriately Pleaded the Defense .................................................................9

    D. UMB's Other Arguments Disregard Relevant Facts .............................................10

III. CONCLUSION.................................................................................................................10

Table of Authorities

Page(s)

Cases

*Applestein v. Province of Buenos Aires*,
    415 F.3d 242 (2d Cir. 2005) ................................................................................................. 9

*Carey v. Pa. Enters., Inc.*,
    876 F.2d 333 (3d Cir. 1989) ................................................................................................. 3

*City of N.Y. v. State of N.Y.*,
    40 N.Y.2d 659 (1976) .......................................................................................................... 6

*Cline v. 1-888-PLUMBING Grp., Inc.*,
    146 F. Supp. 2d 351 (S.D.N.Y. 2001) .................................................................................. 9

*Cortlandt St. Recovery Corp. v. Bonderman*,
    31 N.Y.3d 30 (2018) ............................................................................................................ 3

*Cortlandt St. Recovery Corp. v. Hellas Telecomm's*,
    790 F.3d 411 (2d Cir. 2015) ............................................................................................... 10

*Crown EMAK Partners, LLC v Kurz*,
    992 A.2d 377 (Del. 2010) .................................................................................................... 3

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
    352 F.3d 775 (2d Cir. 2003) ................................................................................................. 8

*Fund Liquidation Holdings LLC v. Bank of America Corp.*,
    991 F.3d 370 (2d Cir. 2021) ............................................................................................... 10

*GEOMC Co. Ltd. v. Calmare Therapeutics Inc.*,
    918 F.3d 92 (2d Cir. 2019) ................................................................................................... 9

*Law Debenture Tr. Co. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ................................................................................................. 4

*LNC Investments, Inc. v. First Fid. Bank, N.A.*,
    173 F.3d 454 (2d Cir. 1999) ................................................................................................. 6

*Motorola v. Uzan*,
    561 F.3d 123 (2d Cir. 2009) ................................................................................................. 9

*Phoenix Light SF Ltd. v. U.S. Bank N.A.*,
    172 F. Supp. 3d 700 (S.D.N.Y. 2016) .................................................................................. 3

Page(s)

*Quadrant Structured Prods. Co. v. Vertin*,
    23 N.Y.3d 549 (2014) ..................................................................................................4, 8

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...........................................................................................................2

*U.S. v. Bond*,
    762 F.3d 255 (2d Cir. 2014) ...............................................................................................9

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) .............................................................................................10

Statutes and Rules

15 U.S.C. § 77lll(b) ......................................................................................................................6

15 U.S.C. § 77ppp ....................................................................................................................5, 8

Fed. R. Civ. P. 9(a)(2) ..................................................................................................................9

Fed. R. Civ. P. 12(h)(3) ..........................................................................................................9, 10

Fed. R. Civ. P. 15 .........................................................................................................................9

Other Authorities

Am. Bar Found., *Commentaries on Model Debenture Indenture Provisions*,
    § 1-4(b) (1971) ...................................................................................................................4

15 N.Y. Jur. 2d § 932 (Nov. 2023) ...............................................................................................3

## I. **INTRODUCTION**

This motion is not about the merits of claims asserted by plaintiff UMB Bank, N.A. ("UMB") against Bristol-Myers Squibb Company ("BMS") for alleged breach of the CVR Agreement. Whenever those claims are adjudicated, the record will show BMS far exceeded any applicable standard in pursuing FDA approval of liso-cel amidst the worst pandemic in a hundred years. But the court that rules on the claims will need to have subject matter jurisdiction. Otherwise, any judgment BMS wins will be subject to challenge by CVR investors contending that UMB was not the trustee and never represented them. *That* is what *this* motion is about.

UMB concedes no one ever obtained the omnibus proxy from The Depository Trust Company ("DTC") that the CVR Agreement required. Opp. at 4, 11. That concession, alone, is dispositive. Without DTC's written delegation of the power to act, there could be no "act of the Majority Holders" to either remove Equiniti as trustee or appoint UMB its successor. CVR Agreement §§ 1.4(a), 4.10(c), (e). UMB never mentions controlling decisions holding, uniformly, that UMB's standing and this Court's subject matter jurisdiction depend on the terms of the indenture. *See* BMS Mem. at 15-16. None of its attempts to change the subject address UMB's lack of injury-in-fact, which deprives the Court of subject matter jurisdiction over the case.

UMB asserts – without support – that it is "common industry practice" to collect consents without going through DTC. Opp. at 14. But courts regularly enforce the DTC omnibus proxy requirement given its importance to the modern system of exchange-based securities trading. UMB does not cite any decision holding otherwise. Nor can the terms of the CVR Agreement be supplanted by such a "custom," even if there were one. UMB also is wrong in contending Equiniti was "the party authorized by contract to accept or reject the Instrument." Opp. at 3. Equiniti had discretion to accept reasonable proof of the "fact" and "date" of execution of a "writing," but that did not give it discretion to ignore registered Holder and record date requirements.

With the plain language of the contract against it, UMB focuses most of its opposition on waiver arguments. But even if BMS could have waived the indenture's requirements for an "act of the Majority Holders," which it did not have authority to do, BMS did not intentionally relinquish any known right. In seeking its appointment, UMB did not disclose, and BMS did not know, that no one had obtained DTC's proxy. UMB relies on a "gotcha" question asked during a Rule 30(b)(6) deposition to argue otherwise, but the full transcript betrays its argument. Further, the contract did not permit BMS and Equiniti to modify its provisions for replacing the trustee without first obtaining "consent of the Majority Holders" to make such a modification. That *also* would have required a DTC proxy. CVR Agreement §§ 6.1(e), 6.2.

UMB premises its arguments on the notion that dismissal based on its failure to be appointed trustee will work hardship on CVR investors. But the only parties impacted by such a ruling will be UMB and its litigation funders. To be sure, UMB stands to lose ▮▮▮▮▮▮▮▮ and its funders could lose their chance (however remote) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ at the expense of other CVR investors. But dismissal without prejudice for lack of subject matter jurisdiction would not prevent Equiniti, which never was removed as trustee, from asserting the same claims against BMS if it determines it should do so.

## II.     THE ACTION SHOULD BE DISMISSED FOR LACK OF JURISDICTION

UMB had no injury-in-fact when this suit was filed, and its opposition confirms it has none now. As a result, the Court does not have Article III jurisdiction to decide the merits of UMB's claims and the case should be dismissed. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

### A.     The Plain Language of the CVR Agreement Requires Dismissal.

In its opposition, UMB mischaracterizes the CVR Agreement and misrepresents the discovery record. Even so, UMB does not dispute that none of the beneficial owners who purportedly signed on to remove Equiniti as trustee, and appoint UMB its successor, was

2

authorized under the contract to do so. It admits Cede & Co., as DTC's nominee, was the registered Holder for all relevant CVRs and no one obtained its proxy, much less one for a "record date." Opp. at 2, 14. Any "action" must be "evidenced" in a writing signed by "Holders . . . or by an agent *duly appointed in writing*," and only Holders "at [the] record date (*or their duly designated proxies*)" are entitled to "take such action[.]" CVR Agreement § 1.4(a) (emphasis added).

UMB does not claim these provisions are ambiguous. Opp. at 13-15. Nor can they be disregarded, as its opposition urges. Opp. at 14-15; *see Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (indenture controls right to sue); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 711 (S.D.N.Y. 2016) ("plain language" of indenture "treats registered holders differently from beneficial owners").

Along with other provisions, they were included in the indenture so that CVRs could be publicly traded – which is how UMB's financial backers accumulated their beneficial interests. *See* CVR Agreement §§ 1.4(a), 1.4(c), 3.5(b)(ii), 3.8 (record vs. beneficial ownership). They also made it imperative for open-market investors who wanted to remove and replace the trustee to obtain DTC's proxy to do so. *See Carey v. Pa. Enters., Inc.*, 876 F.2d 333, 339-41 (3d Cir. 1989) (beneficial owners without DTC omnibus proxy "were not entitled to vote those shares"); *Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 396 (Del. 2010) ("The holding of securities through DTC has significance under Delaware law because it is Cede [& Co.], not the DTC-participant banks and brokers, that appears on the stock ledger of a Delaware corporation."); *see also* 15 N.Y. Jur. 2d § 932 (beneficial owners "have no right to vote if they are not record holders").

The opposition asserts it is "a common industry practice" for trustees not to "requir[e] DTC to act as . . . intermediary." Opp. at 14. UMB does not offer any evidence for that assertion, nor has UMB identified any case law that would excuse its failure to obtain an omnibus proxy here.

3

Even if UMB's unsupported assertion were true, no such practice could override the plain language of the CVR Agreement as a matter of New York law. *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 23 N.Y.3d 549, 565 (2014) (rejecting similar argument); *see Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465-66 (2d Cir. 2010) (limits on use for "custom" evidence).[1]

Next, UMB contends that Equiniti was "the party authorized by contract to accept or reject the Instrument" by which investors tried to remove and replace the trustee. Opp. at 3, 14-15. The CVR Agreement does not say anything close. Section 1.4(b) provides, in its entirety, that "[t]he ***fact*** and ***date*** of the execution by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient." (Emphasis added). That provision eliminated historically more stringent indenture requirements for proof of execution. *See* Am. Bar Found., *Commentaries on Model Debenture Indenture Provisions*, § 1-4(b) (1971) (requiring witness affidavit or notary to prove date and execution). But it did not empower Equiniti to disregard the contractual requirements for "Acts of Holders," including that registered Holders must act in person or provide their proxies as of a "record date." *Id.* § 1.4(a).

Equiniti never "determined that it did not need a DTC proxy," as UMB falsely asserts. Opp. at 15. According to the record, Equiniti did not consider the issue at all. Equiniti Dep. Tr. 80:6-24; 136:2-23, 167:9-16. In discovery, Equiniti's general counsel acknowledged that section 1.4(a) appeared to require "a DTC vote as opposed to individual votes," *id.* at 202:25-

---

[1] Despite UMB's lawyer's repeated assurances that it was not seeking testimony about legal conclusions, *see*, *e.g.*, BMS Dep. Tr. 184:13-185:22, 194:3-18, 383:2-15, its opposition repeatedly cites snippets of deposition testimony by BMS's non-lawyer Rule 30(b)(6) witness for its legal arguments. *See* Opp. at 2; *id.* at 3 (testimony about "how the Agreement was meant to work"); *id.* at 11 (BMS believed "it was [Equiniti's] responsibility" to make determination); *id.* at 12 (BMS "understood that UMB was Trustee"); *id.* at 22 (ways for Holders to "act"). The provisions of the CVR Agreement govern, not UMB's portrayal of a fact witness's deposition testimony about them. Deposition citations are compiled as exhibits in the accompanying Supplemental Declaration of John J. Clarke, Jr. dated April 5, 2024 ("Supp. Clarke Decl.").

203:21, and that Equiniti could not ignore the terms of the indenture, *id.* 204:9-23. Yet at the time, Equiniti did no more than tally the numbers after comparing banking records UMB provided against signature pages in the "Instrument" to make sure the names matched. *Id.* 148:20-167:16.

BMS deferred to Equiniti at the time to determine whether materials submitted by UMB added up to an "act of the Majority Holders," because Equiniti was the entity that owed duties to Holders. But in doing so, BMS did not, and could not, alter the CVR Agreement, under which the Security Register is the *only* relevant proof of ownership and BMS "shall not be affected by any notice to the contrary." CVR Agreement § 1.4(c). Moreover, neither BMS nor Equiniti had the prerogative to disregard the registered Holder or record date requirements, which are for the protection of Holders. *See infra* at 7-8.

The CVR Agreement also belies UMB's argument that the "record date" requirement did not apply because "[c]onsents" have a narrow meaning. Opp. at 22. Section 1.4(a) defines "acts" of Holders broadly, provides that such "acts" shall be taken by Holders in person or in a writing, and requires a record date for "***any*** action in writing without a meeting[.]" CVR Agreement § 1.4(a); *see also* 15 U.S.C. § 77ppp(c) (provisions for record date for action by vote or consent). UMB does not dispute it never tried to establish an "act of the Majority Holders" as of December 18, 2020, which could be the only relevant record date. *See* BMS Mem. at 19. UMB's speculation that it could have done so if it had tried is not evidence and is entitled to no weight. Opp. at 22. Finally, UMB's "acceptance" in the same defective "Instrument" could not result in "finality" under section 4.11 of the agreement, as it contends. *See* BMS Mem. at 21.

B.   **Waiver Doctrines Cannot Prevent Dismissal.**

UMB cannot rely on waiver or related equitable doctrines to overcome the plain language of the CVR Agreement. Contrary to UMB's assertions, BMS did not know that no one had obtained an omnibus proxy from DTC and, in any event, did not have authority to accept as "an

5

act of the Majority Holders" an action not authorized by registered Holders as of a record date. UMB's own inequitable conduct also bars such equitable relief.

Waiver is an equitable defense, and even if it could apply to establish subject matter jurisdiction (it cannot), UMB must prove it by showing an "intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *City of N.Y. v. State of N.Y.*, 40 N.Y.2d 659, 669 (1976) (cleaned up). Ratification requires similar proof. *LNC Investments, Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 463 (2d Cir. 1999). UMB has not made such a showing. When BMS signed the notice to holders reporting that Equiniti had been replaced by UMB as trustee, *see* Exh. 24, it did not know that UMB had not obtained an omnibus proxy from DTC. BMS Dep. 172:15-173:12 ("I think we just didn't know at the time and now we know that they didn't"); *id.* at 380:6-22. BMS did not learn those facts until UMB's deposition in October 2023 (when it then promptly raised the standing issue in a conference with the Court).

During the recent Rule 30(b)(6) deposition of BMS, UMB's lawyer devoted hours to questions of a non-lawyer witness seeking an admission that BMS *should have known* that no one had obtained DTC's omnibus proxy. Of course, BMS knew that BMS itself had not requested an omnibus proxy. It also could review UMB's submissions, and they did not include one. *Id.* 68:14-24; 141:11-151:24, 173:13-18. But until UMB's deposition, BMS did not know what UMB had, or had not, done. BMS Dep. 173:7-18; UMB Dep. 99:11-106:3. At the time, UMB never mentioned DTC or an omnibus proxy – even though its proxy solicitor received an inquiry about it from DTC the day before delivering the "Instrument." Eq. Dep. 136:2-23; 167:9-16; Exh. 16.

UMB's waiver arguments also do not address its own words and actions. It was **UMB** (or its backers) that did not follow procedures for communications with Holders in the Trust Indenture Act. *See* 15 U.S.C. § 77lll(b). It was **UMB** that decided not to set a record date and not to involve

6

DTC or Broadridge in the process.  Okapi Dep. 56:13-16, 103:11-22.  It was *UMB* whose proxy solicitor chose not to respond to a DTC inquiry the day before UMB submitted the "Instrument." *Id.* at 143:15-144:14; *see* Exh. 16 (DTC inquiry that was ignored).  It was *UMB* that prepared the "Instrument," representing it was signed by "Holders" of more than 50% of the CVRs.  Exh. 17.  It was *UMB* that responded to Equiniti's request for evidence that the signatories "were Holders" by providing bank account information and never mentioning that UMB had not obtained (or tried to obtain) a DTC proxy.  Exh. 21 (cover letter).  And it was *UMB* that stalled for eight days, until the start of the New Year's holiday weekend, before finally providing *even that* information in response to Equiniti's request.  Exh. 20.

BMS did not know what UMB knew about these facts when it signed the notice to Holders.  Because Equiniti was the trustee with duties to Holders, BMS looked to Equiniti to determine whether UMB's submissions sufficed.  BMS Dep. 41:18-48:7; Eq. Dep. 197:3-9.  But UMB also did not mention to Equiniti its failure to obtain DTC's omnibus proxy.  Eq. Dep. 136:19-23; *see also id.* 25:12-27:3; 167:9-16.  Equiniti mistakenly believed signatures of beneficial owners by themselves, and without a DTC proxy, were enough.  Eq. Dep. 198:5-16.  BMS cannot be found to have intentionally relinquished any right based on UMB's misleading communications and Equiniti's mistaken understanding of the CVR Agreement.[2]

UMB's waiver argument also conflicts with the CVR Agreement.  Unquestionably, what UMB is advocating is a modification of the requirements for removal and replacement of the

---

[2] UMB tries to minimize the new information BMS learned in discovery based on another misleading deposition citation, Opp. at 18 (asserting that "lawyer's re-read" of CVR Agreement was the basis for this motion), but the testimony again exposes its argument as false.  BMS Dep. 128:6-21 ("There were additional emails, I think . . . I didn't see the depositions of Equiniti and UMB, so I'm not sure specifically what was in those materials or other documents.  But having, you know, read the information that I did read and the definitions of Majority Holders and what you needed to have, it doesn't appear that the appropriate methods were used.").

trustee through waiver. *See* Opp. at 18 (citing *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (listing "waiver or estoppel" among methods to "modify a contract")). But BMS and Equiniti could not "modify" the requirements of sections 1.4(a) and 4.10 without first obtaining "consent of the Majority Holders" to such a change. CVR Agreement § 6.2 (requiring Majority Holder consent for amendments that change "in any manner" or eliminate "any" provisions of the CVR Agreement or "modify[] in any manner the rights of the Holders"). These provisions are to protect Holders, in accordance with the Trust Indenture Act. *See* 15 U.S.C. § 77ppp (bondholder directions and proscriptions on actions by majority).

UMB asserts it is "absurd" for this limitation on amendments to apply to its putative appointment, because UMB used the alleged change in trustees to bring this lawsuit supposedly for Holders' benefit. Opp. at 18. That ignores that in one of UMB's first actions, it entered into a funding agreement that ████████████████████████████████████████████ ████████████████████████████████████████████. *See* Exh. 26 ("Success Fee" of ██████ ████████████████████████████████████████████████████████████████); UMB Dep. 226:15-232:4 (████████████████) *id.* 249:17-261:2 (████████████████ ████████). The CVR Agreement requires formalities to protect Holders against such self-interested behavior. *See Vertin,* 23 N.Y.3d at 565-67 (reasons for indenture formalities).[3]

Further, UMB's litigation arbitrage scheme squarely violates ratable distribution provisions in the contract, CVR Agreement §§ 8.2, 8.3, 8.6, and its lack of candor in communications with BMS and Equiniti was equally inequitable. UMB's inequitable conduct "closes the doors" to equitable relief from this Court to cure UMB's contractual failures, even if

---

[3] UMB claims it "received [other] funding proposals from multiple parties" before agreeing to these troubling financing terms. Opp. at 19. But UMB refused to produce any such proposals, and when asked again confirmed that no such documents exist. Supp. Clarke Decl. Exhs. 30, 31.

8

its equitable arguments were otherwise available (which they are not). *Motorola v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009).

### C. BMS Appropriately Pleaded the Defense.

UMB does not discuss or address governing law in contending that BMS "procedurally waived" its standing argument. Lack of subject matter jurisdiction can be raised at any time and cannot be waived. *U.S. v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014); Fed. R. Civ. P. 12(h)(3). But in addition, BMS expressly pleaded: "the removal of Equiniti as trustee, and the appointment of UMB Bank as successor trustee, were not valid acts of the Majority Holders. UMB Bank is not a valid trustee under the CVR Agreement and therefore lacks the capacity to bring this lawsuit." Answer at 36-37 [ECF No. 35]. BMS was not required to plead all the reasons for that conclusion, which were not facts "peculiarly within [BMS's] knowledge." Fed. R. Civ. P. 9(a)(2). Indeed, BMS did not then know about UMB's failure to obtain an omnibus proxy. *See supra* at 6.[4]

The answer met any applicable pleading specificity requirement. BMS is "entitled to a full opportunity" to assert the defense, including based on information learned in discovery. *GEOMC Co. Ltd. v. Calmare Therapeutics, Inc.*, 918 F.3d 92, 98 (2d Cir. 2019). But to the extent the Court believes the defense should include additional detail, BMS respectfully requests the Court to deem its motion to include a request for leave to amend the second defense to conform to the evidence. *See Cline v. 1-888-PLUMBING Grp., Inc.*, 146 F. Supp. 2d 351, 363 (S.D.N.Y. 2001) ("court may grant leave to amend to permit the assertion of an omitted affirmative defense and may at the same time consider that defense on summary judgment"); Fed. R. Civ. P. 15(a), (b)(1), & (d).

---

[4] In *Applestein v. Province of Buenos Aires*, 415 F.3d 242 (2d Cir. 2005), the plaintiff obtained DTC authorization to sue after the fact, and defendant had not raised standing in its answer *at all*. *Id.* at 245. The decision is of no help to UMB for those and other reasons BMS previously addressed. BMS Mem. at 19 n.10.

### D. UMB's Other Arguments Disregard Relevant Facts.

UMB suggests it "could try to obtain retroactive authorization from DTC," but six months have passed since UMB's deposition revealed the problem and UMB has not obtained it yet. Opp. at 23. UMB admits doing so would be difficult now, *id.*, but that is a problem of its own making.

UMB next argues that "with Equiniti stepping out of the picture," the notice to Holders circulated on January 4, 2021 "should be deemed a constructive appointment" of UMB. Opp. at 19. But Equiniti never "stepped out of the picture." It (mistakenly) understood it had been removed by an "act of the Majority Holders," which is how the change was described. Exh. 24; Eq. Dep. 14:3-17:6. Similarly, because Equiniti was never removed, there is no "vacancy in the office of Trustee" to be filled by a court petition. CVR Agreement § 4.10(e); *see* Opp. at 23-24. UMB's supposedly "close relationship to the injured party" also is not a basis for jurisdiction. Opp. at 21. There is no such "close relationship" here. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 110 (2d Cir. 2008).

Finally, the Second Circuit did not alter the test for Article III standing in *Fund Liquidation Holdings LLC v. Bank of America Corp.*, 991 F.3d 370 (2d Cir. 2021); *see* Opp. at 21. Without injury, there is no Article III standing and dismissal is required. *Id.* at 384. Nor has the real party in interest, Equiniti, "materialize[d]" or sought to join the action. *Id.* at 386. Moreover, dismissal without prejudice would not preclude Equiniti from asserting the claims. "Jurisdictional requirements imposed by the Constitution cannot be cast aside because they are onerous or require expense, or because the results . . . appear unfair or unduly technical." *Cortlandt St. Recovery Corp. v. Hellas Telecomm's*, 790 F.3d 411, 427 (2d Cir. 2015) (Sack, J., concurring).

### III. CONCLUSION

UMB has not suffered injury-in-fact, and the Court therefore lacks subject matter jurisdiction. The action should be dismissed without prejudice pursuant to Rule 12(h)(3).

Dated: New York, New York
      April 5, 2024

DLA PIPER LLP (US)

By: /s/ John J. Clarke, Jr.
    John J. Clarke, Jr.
    Jessica A. Masella
    Steven M. Rosato
    Jessica Park Wright

1251 Avenue of the Americas
New York, New York  10020-1104
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company