UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                  :
UMB BANK, N.A.,                                   :
                                                  :
                              Plaintiff,          :
                                                  :                 21-CV-4897 (JMF)
              -v-                                 :
                                                  :                 OPINION AND ORDER
BRISTOL-MYERS SQUIBB COMPANY,                     :
                                                  :
                              Defendant.          :
                                                  :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This is a $6.4 billion contract dispute arising out of the November 2019 acquisition by

Bristol-Myers Squibb Company ("BMS") of Celgene Corporation ("Celgene").  ECF No. 1

("Compl."), ¶ 2.  In connection with the acquisition, BMS issued to Celgene shareholders

contingent value rights, or CVRs, which would have value only if the Food and Drug

Administration ("FDA") approved marketing applications for three of Celgene's most valuable

products by specified milestone dates.  *Id.* ¶¶ 29, 31.  If FDA approval of any product came even

one day late, the agreement governing the CVRs (the "CVR Agreement") would automatically

terminate and the CVRs would be rendered worthless.  Compl. ¶ 32; *see* ECF No. 1-1 ("CVR

Agrmt.").  The Complaint here alleges that BMS, in order to avoid paying CVR holders the $6.4

billion they otherwise would have been due, slow rolled the approval process for one therapy,

causing it to be approved thirty-six days after the relevant milestone.  Compl. ¶¶ 7, 9, 17.  It

alleges that BMS breached the CVR Agreement by failing to use "Diligent Efforts" to get the

therapy approved on time and by not making its books and records available for inspection upon

request on December 29, 2020, as required by the contract.  *Id.* ¶¶ 34-35, 85-86.

Significantly, the lawsuit was not brought by the holders of the CVRs, who were financially harmed by BMS's alleged breach. Under the terms of the CVR Agreement, the CVR holders themselves could *not* sue to enforce the Agreement; *only* the Trustee for the CVR holders under the CVR Agreement could sue. CVR Agrmt. §§ 8.1, 8.4, 8.6. Nor was the lawsuit brought by Equiniti Trust Company ("Equiniti"), the original Trustee named in the CVR Agreement. Instead, it was brought by UMB Bank, N.A. ("UMB"), which purportedly replaced Equiniti as Trustee a few months before filing suit. *Id.* preamble, ¶ 22. The questions presented here are (1) whether UMB was properly appointed as Trustee before it filed the lawsuit and (2) if not, whether that defect deprives UMB of constitutional standing and, thus, deprives this Court of subject-matter jurisdiction. BMS argues that UMB was not properly appointed because, while the CVR Agreement provides that the Trustee can be removed and a successor Trustee appointed by a majority of *registered* CVR Holders, the appointment of UMB and the removal of the initial Trustee were supported by only a majority of the *beneficial* owners of the CVRs. It further argues that this defect deprives the Court of subject-matter jurisdiction and cannot be cured after the fact. By contrast, UMB contends that its appointment was proper either under the plain terms of the CVR Agreement or because BMS knew of the problem yet treated UMB as the Trustee nevertheless. In the alternative, UMB asserts that any defect is curable and, through a "reconfirmation" process that it pursued earlier this year, has now been cured.

For the reasons that follow, the Court agrees with BMS that UMB was not properly appointed Trustee prior to filing suit and that this defect compels dismissal for lack of subject-matter jurisdiction. After three years of litigation and with so much money at stake, the Court does not reach that conclusion lightly. But the CVR Agreement plainly required the support of a majority of registered Holders to effect UMB's appointment, and UMB and those that sought its

appointment — sophisticated parties all — failed to secure that support.  That inexplicable

failure means that, when this lawsuit was filed, UMB was not the properly appointed Trustee.

That, in turn, means that UMB lacked constitutional standing to bring this lawsuit and that this

Court lacks subject-matter jurisdiction.  To hold otherwise would "carr[y] the [C]ourt[] beyond

the bounds of authorized judicial action and thus offend[] fundamental principles" embodied in

Article III of the Constitution.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94

(1998) (citing cases).  It would also expose any judgment in the case to the risk of a later

collateral attack by disappointed CVR investors.  Accordingly, and for the reasons that follow,

the case must be and is dismissed for lack of subject-matter jurisdiction.  Importantly, however,

that dismissal is without prejudice to a new lawsuit by a properly appointed Trustee.

## BACKGROUND

This dispute stems from BMS's November 2019 acquisition of Celgene, a competitor in

the pharmaceutical industry.  Compl. ¶¶ 2, 28-38.[1]  In September 2018, BMS proposed a merger

that would result in Celgene becoming its wholly owned subsidiary.  *Id.* ¶ 28.  On December 27,

2018, in an effort to bridge a gap between the parties as to Celgene's valuation, BMS proposed

issuing contingent value rights — or CVRs — to Celgene shareholders as additional

consideration for their shares.  *Id.* ¶¶ 28-29.  A CVR is a security that generally requires the

issuer to make a payment to the holder of the security if specified events occur by specified

dates.  *Id.* ¶ 29.  Following months of intense negotiations, BMS and Celgene agreed to a set of

terms, which were ultimately memorialized in a merger agreement and accompanying CVR

---

[1]    The following summary is drawn from the Complaint, the materials submitted by the
parties in connection with the instant motion, and the Court's previous Orders in this case.  *See
Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

Agreement — between BMS and Equiniti, as Trustee for the CVR holders — that became effective on November 20, 2019. *Id.* ¶¶ 30, 36-38.

In brief, the deal involved the issuance of CVRs by BMS that would each provide for a one-time $9 payment if certain "milestones" were met — namely, approval by the FDA of three Celgene products — Liso-cel, Ozanimod, and Ide-cel — by specific dates. *Id.* ¶¶ 30-31. The first such "milestone" deadline, for Liso-Cel and Ozanimod, was December 31, 2020; the milestone deadline for Ide-cel was March 31, 2021. *Id.* ¶ 32. If the milestones for all three products were met, BMS would owe the CVR holders a total of $6.4 billion; if any milestone was missed, the CVRs would expire worthless, and BMS would owe the CVR holders nothing. *Id.* ¶ 32. For its part, BMS was required by the CVR Agreement to "use Diligent Efforts to achieve the Milestone[s]" — with "Diligent Efforts" defined as the "efforts of a Person to carry out its obligations in a diligent manner using such effort and employing such resources normally used by such Person in the exercise of its reasonable business discretion relating to the research, development or commercialization of a product, that is of similar market potential at a similar stage in its development or product life." *Id.* ¶ 34 (quoting CVR Agrmt. §§ 7.8, 1.1).

## A. The CVR Agreement

Several provisions of the CVR Agreement are relevant here. First, the Agreement provides that only the Trustee is authorized to bring suit in the event of a default. Specifically, Section 8.1 provides that, in the event of a default, "either the Trustee by notice in writing to the Company or the Trustee upon the written request of the Majority Holders by notice in writing to the Company (and to the Trustee if given by the Majority Holders), shall bring suit to protect the rights of the Holders." CVR Agrmt. § 8.1; *see also id.* § 8.4 ("In case an Event of Default has occurred, has not been waived and is continuing, the Trustee may in its discretion proceed to

protect and enforce its rights and the rights of the Holders under this CVR Agreement by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights . . . ."). Additionally, Section 8.6 — a so-called "no action clause" — provides that, with certain narrow exceptions not applicable here, "no Holder of any Security shall have any right by virtue or by availing of any provision of this CVR Agreement to institute any action or proceeding at Law or in equity or in bankruptcy or otherwise upon or under or with respect to this CVR Agreement." *Id.* § 8.6.

Second, the Agreement includes provisions regarding the resignation or removal of the Trustee and appointment of a successor Trustee. As relevant here, Section 4.10(b) provides that "[t]he Trustee . . . may resign at any time by giving written notice thereof to the Company." *Id.* § 4.10(b). Section 4.10(c) provides that "[t]he Trustee may be removed at any time by an act of the Majority Holders, delivered to the Trustee and to the Company." *Id.* § 4.10(c). And Section 4.10(e) provides, in relevant part, that

> [i]f the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, the Company, by a Board Resolution or an action of the chief executive officer of the Company, shall promptly appoint a successor Trustee. If, within one year after any resignation, removal or incapacity, or the occurrence of such vacancy, a successor Trustee shall be appointed by act of the Majority Holders delivered to the Company and the retiring Trustee, then the successor Trustee so appointed shall . . . become the successor Trustee and supersede the successor Trustee appointed by the Company.

*Id.* § 4.10(e). Finally, Section 4.10(f) provides that "[t]he Company shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event . . . to the Holders of Securities as their names and addresses appear in the Security Register." *Id.* § 4.10(f).

Significantly, "Holders" and "Majority Holders" are terms defined in the Agreement. "Holder" is defined as "a Person in whose name a Security is registered in the Security

Register." *Id.* § 1.1.  And "Majority Holders" are "Holders of at least a majority of the

Outstanding CVRs" at "the time of determination." *Id.*  Further, Section 1.4, which governs

"Acts of Holders," provides that such acts "may be embodied in and evidenced by one or more

instruments . . . signed by such Holders in person or by an agent duly appointed in writing" and

that BMS "may set a record date for purposes of determining the identity of Holders entitled to

vote or consent to any action by vote or consent authorized or permitted under this CVR

Agreement." *Id.* § 1.4.  If no record date is set, "the record date . . . shall be the first date on

which a signed written consent setting forth the action taken or proposed to be taken is delivered

to the Company." *Id.*  Section 1.4 also provides that "[t]he fact and date of the execution by any

Person of any such instrument or writing may be proved in any reasonable manner which the

Trustee deems sufficient," *id.* § 1.4(b), and that "[t]he ownership of Securities shall be proved by

the Security Register.  Neither the Company nor the Trustee . . . shall be affected by any notice

to the contrary," *id.* § 1.4(c).

    Finally, the CVR Agreement contains provisions governing amendments.  First, Section

6.1 provides that, "[w]ithout the consent of any Holders, the Company and the Trustee, at any

time and from time to time, may enter into one or more amendments hereto or to the Securities,

for" several enumerated "purposes," one of which is "to make any other provisions with respect

to matters or questions arising under this CVR Agreement; provided, that such provisions shall

not adversely affect the interests of the Holders." *Id.* § 6.1.  And Section 6.2 provides that,

subject to certain restrictions not relevant here, "[w]ith the consent of the Majority Holders, by

Act of said Holders delivered to the Company and the Trustee, the Company (when authorized

by a Board Resolution or the chief executive officer of the Company) and the Trustee may enter

into one or more amendments hereto or to the Securities for the purpose of adding any provisions

to or changing in any manner or eliminating any of the provisions of this CVR Agreement or to the Securities or of modifying in any manner the rights of the Holders under this CVR Agreement or to the Securities." *Id.* § 6.2.

**B. UMB's Purported Appointment as Trustee**

The events relevant to this motion began in or about November 2020, as some CVR investors grew increasingly concerned that BMS would miss one or more of the milestone deadlines. In anticipation of that possibility, and litigation to follow, some CVR investors, UMB, and the existing Trustee, Equiniti, began to discuss replacing Equiniti with UMB as Trustee. *See, e.g.*, ECF No. 77-4 ("Pentwater Dep."), at 98; ECF No. 96-20 ("Equiniti Dep."), at 31. UMB was perceived by some investors to be better suited to bring litigation as a trustee. *See* Pentwater Dep. 85-87; Equiniti Dep. 36, 43; ECF No. 77-2 ("UMB Dep."), at 23-25. On December 9, 2020, Pentwater Capital Management LP ("Pentwater") — a beneficial holder of many CVRs — issued a press release seeking the support of other holders, announcing that Okapi Partners LLC ("Okapi"), a proxy solicitation firm, was coordinating the process. *See* ECF No. 77-11. Okapi apparently deferred to UMB in its belief that securing the support of a majority of *beneficial* CVR holders would be sufficient to effect the substitution. *See* ECF No. 77-5 ("Okapi Dep."), at 65-69. After the Pentwater press release, Okapi received questions about the process, including some about whether the consent of *registered* holders was required. *See, e.g.*, ECF Nos 77-13, 77-14. On December 17, 2020, the Depository Trust Company ("DTC"), which, through its nominee Cede & Co., is the registered holder of over 99% of the CVRs, *see* ECF No. 77-25, reached out to Okapi to inquire whether it would be receiving a consent solicitation notice, *see* ECF No. 77-16. Despite these inquiries, UMB and Okapi persisted in their approach of seeking support only from beneficial CVR holders and, on

December 18, 2020, sent a letter to BMS "notif[ying]" it that "the Holders of not less than 50% of the principal amount of CVRs Outstanding have removed Equiniti as trustee under the Agreement, and appointed UMB Bank, National Association, as successor trustee."  ECF No. 77-17, at 2.  They enclosed an "Instrument of Removal, Appointment and Acceptance" and the signatures of several investors with substantial CVR positions.  *See id.* at 5-242.

In an email dated December 22, 2020, counsel for BMS sought confirmation from Equiniti that UMB had in fact received the required support.  ECF Nos. 77-18.  Expressing "a number of concerns" about the Instrument purporting to substitute UMB as Trustee, counsel observed: "We are aware that it is [Equiniti's] responsibility, as Trustee, to make the 'determination' that it has been 'removed . . . by an act of the Majority Holders[.]'"  *Id.* at 2 (citing CVR Agrmt. §§ 1.1, 4.10(c)).  In turn, Equiniti asked UMB to "provide proof that the Holders who have joined the Instrument were Holders as of December 9, and that the number of CVRs owned by each of those Holders as of December 9 is accurately recorded."  ECF No. 77-20, at 3.  On December 31, 2020, after ignoring Equiniti's inquiries for several days, UMB sent a letter to Equiniti enclosing proof of the beneficial ownership of the investors who had signed the Instrument.  ECF No. 77-21; *see also* ECF No. 77-22.  Counsel for BMS indicated it would "look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee," ECF No. 77-23, at 3, and, on January 4, 2021, Equiniti issued a "Notice to Holders," signed by BMS, indicating that "not less than 50% of the outstanding CVRs have removed the Trustee, Equiniti Trust Company, and appointed a successor Trustee, UMB Bank, National Association," ECF No. 77-24.  As of that date, both BMS and Equiniti believed that UMB had been appointed Trustee.  *See, e.g.*, Equiniti Dep. 13; ECF No. 96-12 ("BMS Dep."), at 186.  Significantly, DTC did not execute the instrument purporting to effect the

substitution, and no omnibus proxy from DTC was procured.  *See, e.g.*, Equiniti Dep. 167; ECF No. 77-2 ("UMB Dep."), at 99-100.

## C.  UMB Files Suit

In the meantime, the Liso-cel milestone deadline passed on December 31, 2020, without FDA approval.  Compl. ¶ 78.  The next day, BMS announced that — because that milestone had not been met — the CVR Agreement had "automatically terminated" and the CVRs were "no longer eligible for payment."  *Id.* ¶ 79.  That was true even though FDA approval arrived thirty-six days later.  *Id.* ¶ 80.  On March 4, 2021, UMB, as "Trustee," notified BMS that BMS was in default under the CVR Agreement "because, among other things, [it] had breached its obligations to use Diligent Efforts to achieve the Liso-cel Milestone and to allow [UMB] to investigate [BMS's] books and records" in connection with that missed deadline.  *Id.* ¶ 86; *see* CVR Agrmt. § 8.1 (requiring a notice "specifying [any] default or breach and requiring it to be remedied" to be given "to the Company by the Trustee or to the Company and the Trustee by the Majority Holders," followed by a ninety-day cure period, before suit can be brought).  After ninety days passed without BMS curing the alleged defaults, UMB filed this lawsuit on June 3, 2021.  Compl. ¶ 86.  UMB brings suit "solely in its capacity as Trustee" under the CVR Agreement.  *Id.* preamble.  The Complaint alleges that, "[o]n December 18, 2020, UMB succeeded Equiniti Trust Company as Trustee of an express trust for the benefit of the holders of CVRs under the CVR Agreement."  *Id.* ¶ 22; *see also id.* ¶¶ 95, 105 (alleging that UMB, "as trustee of an express trust for the benefit of the CVR holders, has suffered damages").

On July 23, 2021, BMS first moved to dismiss this case for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF No. 17.  After the Court denied that motion, *see UMB Bank N.A. v. Bristol-Myers Squibb Co.*, No. 21-CV-4897 (JMF),

2022 WL 2290609, (S.D.N.Y. June 24, 2022) (ECF No. 33), BMS filed an Answer and

discovery commenced.  *See* ECF No. 35 (Answer); ECF No. 39 (Civil Case Management Plan).

Several months into discovery, BMS first raised the notion that UMB lacked standing because it

had not properly been appointed Trustee pursuant to the CVR Agreement.  *See* ECF Nos. 61, 63.

Thereafter, BMS moved, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, to

dismiss on that ground, arguing that, at the time this suit was filed, Equiniti had not properly

been removed as Trustee and UMB had not properly been appointed as successor Trustee.  ECF

No. 73; *see also* ECF No. 76 ("BMS Mem."); ECF No. 95 ("UMB Opp'n"); ECF No. 105

("BMS Reply").  After the motion was fully briefed, UMB alerted the Court to new "record

evidence that was unavailable as of UMB's Opposition," namely that "the CVR holders have

now obtained proxies from Cede & Co. (the Registered Holder and Nominee for the Depository

Trust Company) for UMB's appointment as Trustee as of both December 9 and 18, 2020 —

reflecting the will of the CVR holders both then and now."  ECF No. 116.  The parties submitted

supplemental briefs addressing these developments.  *See* ECF Nos. 120, 122-24, 128-31.  On

September 6, 2024, the Court heard oral argument on the motion.

## LEGAL STANDARDS

"[F]ederal courts are courts of limited jurisdiction and, as such, lack the power to

disregard such limits as have been imposed by the Constitution or Congress."  *Purdue Pharma

L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (internal quotation marks omitted).  Article

III of the Constitution "restricts the federal 'judicial Power' to the resolution of 'Cases' and

'Controversies.'"  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).

"That case-or-controversy requirement is satisfied only where a plaintiff has standing" to bring

suit, which requires the plaintiff to "adequately establish," among other things, "an injury in fact

(*i.e.*, a 'concrete and particularized' invasion of a 'legally protected interest')." *Id.* (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). And significantly, Article III standing

is a threshold requirement that must be met at the outset of a case. *See Lujan*, 504 U.S. at 570

n.5 ("[S]tanding is to be determined as of the commencement of suit."); *see also Davis v. Fed.*

*Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on

whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was

filed." (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180

(2000))). Separate and apart from *Article III* standing, a plaintiff must generally also have

"*prudential* standing," a requirement that "normally bars litigants from asserting the rights or

legal interests of others in order to obtain relief from injury to themselves." *Patterson v.*

*Patterson*, No. 20-CV-2552 (PMH), 2022 WL 356513, at *4 (S.D.N.Y. Feb. 7, 2022) (quoting

*Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015)) (emphasis added).

"The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by

a party, or by a court on its own initiative, at any stage in the litigation." *Lewis v. Bureau of*

*Alcohol, Tobacco & Firearms*, No. 16-CV-1057 (RPK), 2021 WL 2576731, at *2 (E.D.N.Y.

June 23, 2021) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006)). Indeed, Rule

12(h)(3) — the basis for BMS's motion here — "requires that '[i]f the court determines at any

time that it lacks subject-matter jurisdiction, the court must dismiss the action.'" *Wells Fargo*

*Bank Northwest, N.A. v. Synergy Aerospace Corp.*, No. 16-CV-8065 (JPO), 2017 WL 3393945,

at *2 n.2 (S.D.N.Y. Aug. 7, 2017) (quoting Fed. R. Civ. P. 12(h)(3)). "Motions brought pursuant

to Rule 12(h)(3) are subject to the same standards as motions to dismiss for want of subject

matter jurisdiction brought pursuant to Rule 12(b)(1)." *Id.* When resolving such a motion, "a

district court may refer to evidence outside the pleadings, and the plaintiff bears the burden to

prove subject-matter jurisdiction by a preponderance of the evidence." *Morrow v. Ann Inc.*, No. 16-CV-3340 (JPO), 2017 WL 363001, at *2 (S.D.N.Y. Jan. 24, 2017); *see also Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."). When considering a motion to dismiss for lack of subject-matter jurisdiction, a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison*, 547 F.3d at 170 (cleaned up).

## DISCUSSION

UMB makes several important concessions. First, it concedes, as it must, that "only a properly appointed Trustee would have standing to bring" this lawsuit. *See* ECF No. 165 ("Oral Argument Tr."), at 16-17; *see also* UMB Opp'n 13, 21. Second, and relatedly, it acknowledges that its standing (or lack thereof) turns on whether it was (or is) the Trustee because it was not itself a beneficial CVR owner and, thus, it has no independent stake in the controversy. *See* UMB Dep. 91; Oral Argument Tr. 16-17. Third, it admits that the CVR Agreement, by its terms, permitted removal of a Trustee and appointment of a successor Trustee only by an "act of the Majority Holders," UMB Opp'n 13 (quoting CVR Agrmt. § 1.4(c)), and that "Holder" is defined as "a Person in whose name a Security is *registered* in the Security Register," CVR Agrmt. § 1.1 (emphasis added); *see* UMB Opp'n 13; Oral Argument Tr. 17. Fourth, it concedes that the sole instrument purporting to remove Equiniti and install UMB "was endorsed" only "by the CVRs' *beneficial* owners." UMB Opp'n 1 (emphasis added). DTC, which, "through its nominee Cede & Co., [was] the Registered Holder for 99% of the CVRs," neither executed the instrument itself nor provided an omnibus proxy. *Id.*; *see also id.* at 5, 10; Oral Argument Tr. 18-20. And finally,

12

UMB acknowledges that the CVR Agreement was neither modified nor amended pursuant to the procedures in Sections 6.1 and 6.2. *See, e.g.*, Oral Argument Tr. 47-48; UMB Opp'n 18 & n.4. Despite these concessions, UMB argues that it was "properly appointed as Trustee" prior to filing suit. *See, e.g.*, UMB Opp'n 13-15; Oral Argument Tr. 18, 20-28. In the alternative, it argues that any defect in its appointment could be cured after the fact and has been. *See, e.g.*, UMB Opp'n 23-24; ECF No. 122 ("UMB's Supp. Mem."), at 2-8; Oral Argument Tr. 59-68.

UMB is wrong on both counts.

## A. UMB Was Not Properly Appointed as Successor Trustee

First, because UMB's appointment was not made by "an act of the Majority Holders" as that term is defined in the CVR Agreement, it was not properly appointed as Trustee prior to filing this lawsuit. UMB asks the Court to disregard the plain language of the CVR Agreement on the grounds that DTC is merely an "intermediary," *see, e.g.*, Oral Argument Tr. 18-19, and that "it is a common industry practice for trustees to accept proof of a majority of beneficial holders' direction of a corporate action, instead of requiring DTC to act as their intermediary," *see* UMB Opp'n 14. But New York law, which governs the CVR Agreement, *see* CVR Agrmt. Ann. B, forecloses this request, as it is well established that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Cortland St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (quoting *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 559-60 (2014)); *see, e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 253-55 (2d Cir. 2018) ("New York law requires that we give effect to the plain meaning of the Indenture Agreements' unambiguous terms."); *see also, e.g.*, *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 711 (S.D.N.Y. 2016) (applying New York law and rejecting an interpretation of

the agreements at issue on the ground that it "ignore[d] the plain language . . . treat[ing] registered holders differently from beneficial owners").

Perhaps recognizing the weakness of this extra-contractual argument, UMB makes two efforts to show that its appointment was proper under the language of the CVR Agreement, but these efforts fall short. First, UMB focuses on Section 1.4 of the CVR Agreement, which outlines the nature of the instrument or writing needed to give effect to any act of the Majority Holders, *see* CVR Agrmt. § 1.4(a), and then provides that "[t]he fact and date of the execution by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient," *id.* § 1.4(b). Citing this provision, UMB argues that, "[a]lthough the CVR Agreement defines 'Holders' as the CVR's registered holders, it delegates the authority to determine whether an 'act' has the support of the 'Majority Holders' to the existing Trustee" — which, at the time, was Equiniti. *See* UMB Opp'n 13 (internal citation omitted); Oral Argument Tr. 21-24. Equiniti's acceptance of the substitution alone, the argument goes, was therefore sufficient to render the substitution effective. *See* UMB Opp'n 13-15. To the extent that Section 1.4(b) gives the Trustee discretion to make determinations with respect to instruments, however, that discretion is limited, by its terms, to only "[t]he fact and date" of the instrument's "execution." *See* CVR Agrmt. § 1.4(b). Section 1.4(b) did not delegate to Equiniti unchecked authority to determine whether an action constituted "an act of the Majority Holders." Nor did it give Equiniti carte blanche to ignore and override the explicit requirements in Section 4.10 for removal and appointment of Trustees.

Second, UMB points to Section 4.10(e), which, as noted, provides that "[i]f the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, the Company, by a Board Resolution or an action of the chief executive

14

officer of the Company, shall promptly appoint a successor Trustee." *Id.* § 4.10(e); *see* UMB Opp'n 19. "[W]ith Equiniti stepping out of the picture," UMB contends, "BMS had a duty" under Section 4.10(e) "to appoint a successor Trustee." UMB Opp'n 19. And it should be understood as having exercised that appointment authority — at least "constructive[ly]" — through its "express endorsement of UMB to the CVR holders as the correct Trustee" on January 4, 2021. *Id.* But this argument flounders at each step. For starters, the condition precedent for BMS to appoint a successor Trustee never arose. For the reasons discussed above, Equiniti was not properly "removed" under the terms of Section 4.10. Nor did it "resign." *See, e.g.*, Equiniti Dep. 21-22; *see also* Oral Argument Tr. 25 (UMB's counsel conceding that "Equiniti . . . *didn't resign*" (emphasis added)). Equiniti may have subjectively believed that it had been removed as Trustee, but a subjective belief of removal does not a removal under Section 4.10 make. In any event, BMS cannot be said to have appointed UMB as successor Trustee under Section 4.10(e) because it is undisputed that there was no "Board Resolution or [] action of the chief executive officer" of BMS to appoint UMB. *See, e.g.*, Oral Argument Tr. 15-16 ("The only people involved were an assistant secretary and the corporate secretary."); ECF No. 77-24 (displaying only the signature of a Corporate Secretary on behalf of BMS in its "Notice to Holders" that UMB had been appointed successor Trustee). Here too, accepting UMB's theory would require the Court to "disregard the plain meaning of the . . . Agreement," *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 153 (S.D.N.Y. 2007), and that the Court cannot and will not do.[2]

_____

[2]    BMS argues that UMB's appointment was defective not only because it was not effected by "an act of the Majority Holders," but also because BMS was never asked to set a "record date for purposes of determining the identity of Holders entitled to vote or consent to any action by vote or consent authorized or permitted under th[e] CVR Agreement." BMS Mem. 18-19; *see* CVR Agrmt. § 1.4(a). But because, as BMS concedes, *see* BMS Mem. 19, the record date defaults to "the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company," CVR Agrmt. § 1.4(a), the argument

Perhaps recognizing the weakness of its contractual arguments too, UMB makes one final stab at defending its appointment as Trustee by invoking the "doctrines of ratification and waiver." *See* UMB Opp'n 16-19.  By failing to object to the instrument at the time and then treating UMB as the properly appointed successor Trustee, the argument goes, BMS either waived its right to object to UMB's appointment or ratified that appointment.  *See id.*  There is, no doubt, some intuitive appeal to this argument, as BMS could have, and arguably should have, recognized at the time that Equiniti's purported removal and UMB's purported appointment were not properly endorsed by "an act of the Majority Holders" within the meaning of the CVR Agreement.  For example, in a December 22, 2020 email, BMS was explicitly told by Equiniti that "[n]one of the shareholders listed are registered holders," *see* ECF No. 77-18, at 4, and BMS's corporate representative conceded that, "at th[at] point in time Bristol-Myers knew that none of the signatories to the instrument of removal were Registered Holders," *see* BMS Dep. 116.  In the same email chain, BMS expressed its "concern . . . that it 'cannot verify' the holders listed as signatories to the Instrument" and stated that, "[o]n its face, the information provided by UMB is insufficient and requires further verification."  ECF No. 77-18, at 2.  Further, BMS knew that DTC was the Registered Holder of over 99% of the CVRs, *see* BMS Dep. 107-08, and that there had been no proxy effort at that point, *see id.* at 120.  Yet it chose to defer entirely to Equiniti.  *See, e.g.*, *id.* 149 ("We relied on Equiniti to make that determination.  We asked them if this was enough support and we relied on their determination."); ECF No. 77-23, at 3 (email stating that BMS "would look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee").

---

ultimately collapses into the argument that the instrument purporting to install UMB as Trustee was a not valid "act of the Majority Holders" in the first instance.

Intuitive appeal aside, however, there is no basis to apply either waiver or ratification here.  For starters, waiver and ratification are typically affirmative defenses that "may be pled in defense of claims for breach of contract and breach of trust." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN) (BCM), 2016 WL 4613390, at *15 (S.D.N.Y. Aug. 31, 2016); *see also LNC Invs., Inc. v. First Fid. Bank*, 126 F. Supp. 2d 778, 797 (S.D.N.Y. 2001).  Tellingly, the portion of UMB's opposition brief addressing waiver and ratification does not — aside from a single paragraph describing the elements of waiver and ratification generally — cite a *single case* supporting application of these doctrines under circumstances like those here.  *See* UMB Opp'n 16-19.  When pressed at oral argument, UMB's counsel could still offer no authority for its argument, instead purporting to assert that the Court should consider BMS's instant motion to dismiss as the functional equivalent of a breach of contract claim or a claim for recission.  *See* Oral Argument Tr. 39-42, 83.  But as the Court observed at oral argument, BMS is "asking for dismissal of this suit without prejudice on the grounds that [UMB] lack[s] standing.  That's not rescission."  *See id.* at 39-40.  Nor is there a claim for breach before the Court.  Put simply, UMB does not cite, and the Court has not found, any authority supporting application of waiver or ratification under the circumstances here, namely in opposition to a motion to dismiss for lack of subject-matter jurisdiction.

In any event, even if the doctrines of waiver and ratification could apply here as a matter of law, UMB fails to establish that they do as a matter of fact.  "A contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned,'" but "waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection."  *Luitpold Pharma., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset*

*Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006)); *see LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey*, 173 F.3d 454, 463 (2d Cir. 1999) ("In order to establish that the Bondholders waived their objections to the Trustees' conduct, for example, the Trustees would have to demonstrate, among other things, that the Bondholders effected a 'deliberate, informed abandonment of known rights.'" (quoting 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 84)).  And a party asserting a ratification defense must show that the purported ratifier "acted 'with full knowledge of all material facts relating to the transaction.'" *LNC Invs., Inc.*, 173 F.3d at 463 (quoting 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 76)); *see also In re Adelphia Recovery Tr.*, 634 F.3d 678, 693 (2d Cir. 2011) ("The intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.'" (quoting *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999))).

UMB fails to meet these high standards.  There is no record evidence evincing any "intent to relinquish a contractual protection" *Luitpold Pharma., Inc.*, 784 F.3d at 95, or "deliberate, informed abandonment of known rights," *LNC Invs., Inc.*, 173 F.3d at 463, made "with full knowledge of all material facts," *id.* at 463.  Indeed, the email exchange discussed above reveals that BMS attempted — albeit unsuccessfully and arguably insufficiently — to "ensure that the appropriate due diligence was carried out to avoid any future challenge by any holder to the change in Trustee," and confirmed its understanding that the instrument "be[] delivered by 'Majority Holders' rather than by Persons merely purporting to be Holders as of a relevant date."  ECF No. 77-18, at 2.  Along similar lines, the email indicating that BMS "would look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee," ECF No. 77-23, at 3, cannot be read as evincing any explicit or implicit intent to agree to a deviation from the requirements of the CVR Agreement.  To be sure,

the record might support a conclusion that BMS *should have* known that the instrument removing Equiniti and installing UMB was not sufficient under the CVR Agreement.  That, in turn, might be enough to establish carelessness or negligence in relying on Equiniti's determination that adequate proof had been furnished.  But "'mere silence, oversight or thoughtlessness in failing to object' is insufficient to support an inference of waiver," *Luitpold Pharma., Inc.*, 784 F.3d at 95 (alteration omitted) (quoting *Courtney-Clarke v. Rizzoli Int'l Publ'ns, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998)), and "[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur," *In re Adelphia Recovery Tr.*, 634 F.3d at 693-94.

In sum, the instrument purporting to remove Equiniti as Trustee and appoint UMB as successor Trustee was plainly inadequate under the unambiguous terms of the CVR Agreement, and neither waiver nor ratification permits the Court to disregard or alter those terms.  It follows that UMB was not the "properly appointed Trustee" at the time it filed this lawsuit and, thus, lacked standing to sue BMS for its alleged default on behalf of the CVR holders.

**B.  UMB's Lack of Standing Cannot Be Cured**

That defect mandates dismissal because the absence of standing at the time the lawsuit was filed means the Court lacks subject-matter jurisdiction.  *See Lujan*, 504 U.S. at 570 n.5; *see also Davis*, 554 U.S. at 734.  "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception."  *Steel Co.*, 523 U.S. at 94-95 (cleaned up).  Or as the Supreme Court has long held: "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining

to the court is that of announcing the fact and dismissing the cause.'" *Id.* at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

UMB asks the Court to disregard these fundamental and long-established principles, but its arguments on that score fall short.  First, relying on *Allan Applestein TTEE FBO D.C.A. Grantor Trust v. Province of Buenos Aires*, 415 F.3d 242 (2d Cir. 2015), and *Lovati v. Petróleos de Venezuela, S.A.*, No. 19-CV-4799 (ALC), 2021 WL 5908953 (S.D.N.Y. Dec. 14, 2021), UMB argues that "where DTC authorization is required to exercise a right under the terms of an agreement such as an indenture, that authorization need not pre-date the exercise thereof, including for the purpose of establishing standing at the time of suit."  UMB's Supp. Mem. 1-2 (internal quotation marks omitted); *see also* UMB Opp'n 20-21.  But the dispute in *Applestein* and *Lovati* related to prudential, not Article III, standing because the plaintiffs in both cases were beneficial owners of the instruments at issue who had suffered harm; the sole issues were therefore whether, as a matter of contract, they had received authorization to sue.  "As beneficial owners, the plaintiffs satisfied Article III standing by sufficiently pleading a legally protected interest at the inception of this case: they alleged a monetary loss, directly traceable to Defendant's alleged breach, redressable by [the] [c]ourt," *Lovati*, 2021 WL 5908953, at *2; *see also Applestein*, 415 F.3d at 245-46.  Here, by contrast, "UMB's sole conceivable source of standing . . . is in its capacity as [T]rustee," Oral Argument Tr. 16, and, as discussed, UMB had not been validly installed as successor Trustee when it filed this suit.  UMB thus lacked any "conceivable" injury-in-fact, which goes to its Article III standing.  *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  That is not, as UMB repeatedly insists, "a distinction without a difference," UMB Opp'n 21; Oral Argument Tr. 61.  Instead, it is a difference of constitutional proportions.

Second, UMB relies on the Second Circuit's decision in *Fund Liquidation Holdings LLC v. Bank of America Corporation*, 991 F.3d 370 (2d Cir. 2021), to argue that the defect in its appointment before filing suit can be retroactively cured. *See* UMB Supp. Mem. 7-8. *Fund Liquidation Holdings* involved a suit by two Cayman Islands investment funds regarding the manipulation of certain benchmark interest rates. After the suit was filed, the defendants discovered that the two funds "had been dissolved years earlier, and that the case was actually being prosecuted by a separate entity, Fund Liquidation Holdings LLC," which alleged that it had been "assigned the dissolved entities' claims." 991 F.3d at 375. The district court initially permitted Fund Liquidation Holdings to join in its own name pursuant to Rule 17(a)(3) of the Federal Rules of Civil Procedure, which provides that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3); *see Fund Liquidation Holdings LLC*, 991 F.3d at 377. But later, following a challenge by the defendants, the district court dismissed the case for lack of subject-matter jurisdiction on the ground that, because the two funds (the "Dissolved Funds") had "lacked capacity to sue" at the outset, "there was no real 'case or controversy' before the court," and this jurisdictional defect could not be retroactively cured under Rule 17. *See Fund Liquidation Holdings LLC*, 991 F.3d at 377-78.

The Second Circuit vacated and remanded. The Court began by rejecting the defendants' argument that the Dissolved Funds' "pre-filing assignment of their claims stripped [them] of Article III standing," citing the well-established principle that "an assignment does not erase an injury." *Id.* at 380-81 (citing *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730-31 (6th Cir. 2016)). "[T]he Dissolved Funds' alleged injury," the Court reasoned, was no less real and "no

less redressable through an award of damages simply because legal title to their claims" had been transferred to Fund Liquidation Holdings. *Id.* at 381. But, the Court concluded, the Dissolved Funds lacked standing because, under Cayman Islands law, they "did not legally exist when the case was filed." *Id.* at 384. "After all," the Court explained, "the most elemental requirement of adversary litigation is that there be two or more parties, meaning that absent a plaintiff with legal existence, there can be no Article III case or controversy." *Id.* (cleaned up).

The Court then turned to "what to make of that fact." *Id.* at 386. The Court explained that the evolution of pleading requirements culminating in Rule 17 revealed, first, that "the rule concerning which party's name a case must be prosecuted under (either the nominal plaintiff or the real party in interest) is non-jurisdictional," and, second, that there is "no constitutional magic behind whether the name of a nominal plaintiff or a real party in interest is initially put in the caption of a pleading." *Id.* at 388. "When viewed this way," the Court continued, "filing a complaint in the name of a deceased or non-existent nominal plaintiff is akin to an error in the complaint's *allegations* of jurisdiction. And it is well-understood that a plaintiff may cure defective jurisdictional allegations, unlike defective jurisdiction itself, through amended pleadings." *Id.* at 388-89 (citing cases). Rejecting the Sixth Circuit's decision in *Zurich Insurance Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002), that a case started in the name of a plaintiff that lacks standing is a legal nullity, the Court thus held: "Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time." *Id.* at 386.

The Circuit, applying that holding, concluded that the district court had erred in dismissing the case for lack of subject-matter jurisdiction. Substitution of Fund Liquidation

Holdings for the Dissolved Funds, the Court reasoned, "does not substitute a new cause of action over which there is subject-matter jurisdiction for one in which there is not. Rather, a real party in interest who has been assigned a claim is the functional equivalent of the original plaintiff — an assignee steps into the shoes of the assignor. So even though Fund Liquidation is replacing the Dissolved Funds as the named party, it is prosecuting the *Dissolved Funds'* claims." *Id.* at 389 (cleaned up); *see In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2022 WL 3018104, at *4 (S.D.N.Y. July 29, 2022) (noting that "the dissolved funds [in *Fund Liquidation Holdings*] were plainly asserting their own injuries based on the defendants' manipulation of benchmark interest rates"). Pointedly, the Court also noted that these facts were different from those before the Sixth Circuit in *Zurich Insurance*, "in which the originally named plaintiff never possessed a claim against the defendant." *Fund Liquidation Holdings LLC*, 991 F.3d at 389 n.10 (citing *Zurich Ins.*, 297 F.3d at 532).

This Court recently grappled with the implications of *Fund Liquidation Holdings* and other relevant Second Circuit authority in *Alix v. McKinsey & Co.*, — F. Supp. 3d —, No. 18-CV-4141 (JMF), 2024 WL 3293621, at *7-13 (S.D.N.Y. July 3, 2024). In *Alix*, the plaintiff — Jay Alix — brought claims as the purported assignee of AlixPartners LLP under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, against McKinsey & Co. and its various subsidiaries and executives. *See* 2024 WL 3293621, at *1. The Court concluded, however, that the assignment in question did not validly assign AlixPartners LLP's RICO claims to Alix and, thus, that "Alix lacked Article III standing at the time th[e] lawsuit was filed." *Id.* at *5-8. After attempting to harmonize the "confusing, if not internally inconsistent" Second Circuit precedent pertaining to the curability of Article III standing defects, *see id.* at *7-9, the Court concluded that *Fund Liquidation Holdings* did not control and that "the

defect in Alix's suit [was] not amenable to cure," *id.* at \*10-12.  Because Alix "neither suffered the injury for which he sued nor was assigned the claims he brought by the party that did suffer that injury," it *was*, unlike *Fund Liquidation Holdings*, a case "in which the originally named plaintiff never possessed a claim against the defendant."  *Id.* at \*10 (quoting *Fund Liquidation Holdings LLC*, 991 F.3d at 389 n.10).  For that reason, "the defect in [*Alix* was] not merely a 'technical error in the original pleading's caption' — the type of 'merely formal' error that the *Fund Liquidation Holdings* Court held could be cured under Rule 17(a)(3) without giving offense to Article III."  *Id.* (quoting *Fund Liquidation Holdings LLC*, 991 F.3d at 391, 392 n.14). A contrary result would run afoul of Article III, Second Circuit precedent, and the Rules Enabling Act, 28 U.S.C. § 2072, alike.  *See Alix*, 2024 WL 3293621, at \*10-13.

Applying these principles here, the Court concludes that — as in *Alix* — "the defect in [UMB's] suit is not amenable to cure."  *Id.* at \*10.  UMB filed suit as Trustee under the CVR Agreement, but it "neither suffered the injury for which [it] sued nor was" properly installed as Trustee.  *See id.*  Here, "the specific claim in question" is a claim by UMB (as it existed at the time of filing) against BMS.  *See id.* at \*9.  But because UMB was not properly installed as successor Trustee at the time of filing, it had suffered no injury vis-à-vis BMS and so that claim is not one over which the federal courts could exercise jurisdiction consistent with Article III. True, as BMS prudently conceded at oral argument, *Fund Liquidation Holdings* rejected the so-called "nullity doctrine," which provides "that a case initiated in the name of a plaintiff that lacks standing is an incurable nullity."  991 F.3d at 386-87; *see* Oral Argument Tr. 51-52.  But in *Fund Liquidation Holdings*, the Court noted that "even though Fund Liquidation is replacing the Dissolved Funds as the named party, it is prosecuting the *Dissolved Funds'* claims."  991 F.3d at 389.  Here, no party can now step in and prosecute UMB's claims as alleged in this action,

because UMB *had* no justiciable claim against BMS when it filed suit. "Put simply, unlike *Fund Liquidation Holdings*, this *is* a case 'in which the originally named plaintiff never possessed a claim against the defendant.'" *Alix*, 2024 WL 3293621, at \*10 (quoting *Fund Liquidation Holdings LLC*, 991 F.3d at 389 n.10)).

UMB misses the point in arguing that, "even if it does implicate Article III standing, the DTC issue is technical and can be corrected through Rule 17(a)(3) under *Fund Liquidation* and this Court's decision in *Alix*." Oral Argument Tr. 59. First, even if one could describe UMB's failure to obtain pre-suit DTC authorization as merely "technical," the deeper Article III problem here is that, due to that failure, UMB did not become Trustee before filing suit and accordingly suffered no cognizable injury-in-fact. The defect in this suit is thus not a "merely formal," "technical error in the original pleading's caption." *Alix*, 2024 WL 3293621, at \*10. Instead, it "result[ed] in a party lacking injury-in-fact . . . litigating against Defendant[] in federal court." *Id.* at \*11. Second, UMB's argument assumes that Rule 17(a)(3) would permit substitution *of UMB* (post-"reconfirmation" of its appointment of Trustee) *for UMB*. But it cites, and the Court has found, no authority suggesting that Rule 17(a)(3) would permit such a thing.

In any event, to substitute UMB (post-"reconfirmation") as plaintiff in this action — if such a thing were even possible — would require "more than a 'merely formal' alteration of the complaint" and, thus, would exceed the bounds of what Rule 17(a)(3) permits. *Id.* at \*10 (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 424 (2d Cir. 2015)). As the Court explained in *Alix*, "[a]mendments under Rule 17 . . . are 'ordinarily allowed . . . only when a mistake has been made as to the person entitled to bring suit and such substitution will not alter the substance of the action.'" *Id.* (quoting *Cortlandt St. Recovery Corp.*, 790 F.3d at 424). Here, as there, however, a cure would require "more than a 'merely

formal' alteration of the complaint." *Cortlandt St. Recovery Corp.*, 790 F.3d at 424 (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997)). UMB would not only have to substitute itself for itself, but it would also have to amend its Complaint to reflect — whether explicitly or implicitly — the later-obtained Cede & Co. authorization (assuming *arguendo* that such authorization is valid) and to address various allegations about UMB's actions "as Trustee" before filing suit. *See, e.g.*, Compl. ¶¶ 15, 86, 92-93, 96-105. "Such an amendment would not be 'consistent with Rule 17(a)(3).'" *Alix*, 2024 WL 3293621, at *10 (quoting *Cortlandt St. Recovery Corp.*, 790 F.3d at 423); *see Fund Liquidation Holdings LLC*, 991 F.3d at 392 n.14 (citing *Cortlandt Street Recovery Corp.* for the proposition that Rule 17 limits the scope of permissible amendment to the "merely formal").[3]

In short, UMB's lack of Article III standing at the time it filed this lawsuit cannot be cured after the fact. Accordingly, the Court need not and does not decide whether Cede & Co.'s purported post hoc approval effectively installed UMB as successor Trustee because — even if it did — that could not and would not vest the Court with subject-matter jurisdiction over this case. Instead, the Court is compelled to, and does, dismiss the case without prejudice for lack of subject-matter jurisdiction. *See, e.g.*, *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 735 (2d Cir. 2017) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice.").

---

[3]     The *Fund Liquidation Holdings* Court suggested that "more substantive amendments" might be permissible "through a motion made jointly under both Rule 15 *and* Rule 17." 991 F.3d at 392 n.14. But it did not take a position on the issue. *See also id.* at 390 (noting that the Court had "never taken a position on" whether Rule 15(d) could be used to cure a jurisdictional defect that existed at the time of the initial filing and declining to do so there). Neither does the Court here, as UMB has not relied on Rule 15 or any "other rule of civil procedure . . . . It has relied upon only Rule 17." *Cortlandt Street Recovery Corp.*, 790 F.3d at 424-25.

### C.  Sealing

One housekeeping matter remains.  The parties filed a slew of letter motions to seal portions of their motion papers and supporting exhibits.  *See, e.g.*, ECF Nos. 72, 94, 102, 107, 111, 115, 121, 127, 133, 136, 161.  The Court granted these letter motions temporarily, noting that it would assess whether to keep the materials at issue sealed or redacted when deciding the underlying motion.  *See, e.g.*, ECF Nos. 78, 99, 108, 109, 119, 126, 132, 138, 164.

It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  More specifically, a three-part test applies to whether documents may be placed under seal.  First, "a court must . . . conclude that the documents at issue are indeed 'judicial documents' . . . and that therefore a common law presumption of access attaches."  *Id.* at 119.  Second, the court "must determine the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *Id.* (internal quotation marks omitted).  "Finally, . . . the court must balance competing considerations against" the presumption of access, including "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure."  *Id.* at 120 (internal quotation marks omitted).  The party or parties seeking to maintain information filed under seal bear "the burden . . . to demonstrate that the interests favoring non-access outweigh those favoring access."  *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995).

Here, the parties seek to seal (or redact) three principal categories of documents and information: (1) "personally identifying information of non-party CVR holders and their

investment amounts," *e.g.*, ECF No. 136, at 3; (2) the so-called "Merits Discovery Materials," ECF No. 107; *see also* ECF No. 136; and (3) documents pertaining to UMB's efforts to become Successor Trustee, *see* ECF No. 75 (and attached exhibits).[4]  The Court will address each in turn.

First, any references to "personally identifying information of non-party CVR holders and their investment amounts" may remain redacted because they are not relevant to the Court's resolution of the present motion and the "privacy interests of innocent third parties" sufficiently outweigh any presumption of access afforded to these filings.  *See City of Providence v. BATS Glob. Mkts., Inc.*, No. 14-CV-2811 (JMF), 2022 WL 539438, at *2 (S.D.N.Y. Feb. 23, 2022) (quoting *Amodeo*, 71 F.3d at 1050); *see also SOHC, Inc. v. Zentis Sweet Ovations Holding LLC*, No. 14-CV-2270 (JMF), 2014 WL 5643683, at *5 (S.D.N.Y. Nov. 4, 2014) (finding the presumption overcome with respect to redactions "limited to specific 'financial figures and customer information' . . . , which are not relevant to the parties' legal dispute and implicate legitimate privacy interests").

Second, because the Court was presented here only with the threshold jurisdictional question (and found that it lacks jurisdiction), the Court agrees with BMS that the Merits Discovery Materials, and the portions of the parties' briefing referring to them, are not technically "judicial documents."  "A document is relevant to the judicial function if it is *currently* relevant to the judicial function, not if it '*could* later become relevant to the judicial function.'"  *Beach v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 17-CV-563 (JMF), 2019 WL 2428631, at *10 (S.D.N.Y. June 11, 2019) (quoting *United States v. HSBC Bank USA, NA*, 863

---

[4]    Aside from these categories of materials, non-party Pentwater represents that it "has no objection to [a page of a deposition transcript of its founder and CEO] being filed publicly so long as the prior page is file publicly . . . as well."  ECF No. 133, at 1.  Because Pentwater attached both pages to its letter, filed publicly, *see* ECF No. 133-1, the issue is moot.

F.3d 125, 140 (2d Cir. 2017)).  The facts relevant to the merits of the parties' dispute — for example, the facts surrounding the Liso-cel application process — had no bearing on the jurisdictional question decided here.  It follows that, "at this time, [the Merits Discovery Materials] are not properly considered judicial documents."  *Id.*; *see also In re IBM Arbitration Agreement Litig.*, No. 21-CV-6296 (JMF), 2022 WL 3043220, at \*2 (S.D.N.Y. Aug. 2, 2022) (holding, where the Court had granted IBM's motion for judgment on the pleadings, that materials submitted by the plaintiffs in connection with a cross-motion for summary judgment were not properly considered "judicial documents" because they "had no 'tendency' — or, for that matter, ability — 'to influence [this Court's] ruling on [IBM's] motion'" (alterations in original)), *aff'd*, 76 F.4th 74 (2d Cir. 2023).

In the alternative, to the extent these materials could be considered "judicial documents," "the weight of any presumption is limited" given that "the Court did not need to reference or otherwise rely on" the materials.  *In re Accent Delight Int'l, Ltd.*, Nos. 16-MC-125, 16-MC-50 (JMF), 2018 WL 2849724, at \*6 (S.D.N.Y. June 11, 2018).  On the flip side, the interests BMS asserts in favor of maintaining these materials under seal — including the risks of "competitive harm" and misleading the public about Liso-cel — are not insignificant.  Accordingly, the Court finds that the Merits Discovery Materials are not "judicial documents" entitled to a presumption of public access or, in the alternative, are entitled only to a minimal presumption that is sufficiently overcome, and thus may remain in sealed or redacted form.  The same is true for the Prepaid Forward Agreement, which UMB requests to maintain under seal.  *See* ECF No. 72.

By contrast, the Court concludes that the third category of materials — those pertaining to the process through which UMB attempted to become Successor Trustee, including any currently sealed excerpts from the parties' filings that are quoted or cited in this Opinion and

Order — must be unsealed.  These materials go to the heart of the threshold question of whether UMB actually became the Successor Trustee, which — as the Court has explained — ultimately disposes of this motion and this case.  Accordingly, the presumption of public access is strong with respect to these documents, and the parties have not offered any adequate justification for maintaining them under seal altogether.  Accordingly, the parties are directed to confer (including with relevant non-parties who may have designated certain materials confidential) and file on the public docket all exhibits to the Declaration of John J. Clarke, Jr. at ECF No. 75 (and currently under seal at ECF No. 77) that are currently sealed, with any proposed redactions — and a letter explaining the need for such redactions — **within two weeks of this Opinion and Order**.  Okapi has already done so with respect to certain exhibits, and the Court agrees that its proposed redactions are justified, substantially because they fall under the umbrella of private third-party information.  *See* ECF No. 111.

If any party believes there are additional materials that should be unsealed that the Court did not address here, it shall file a letter motion **within a week of this Opinion and Order** explaining the basis for that belief and pointing the Court both to the materials in question and the parties' previous arguments regarding such materials, if any.

## CONCLUSION

For the foregoing reasons, UMB's claims must be and are dismissed for lack of subject-matter jurisdiction.  UMB was not validly appointed as successor Trustee under the CVR Agreement before it filed the lawsuit, so it lacked Article III standing at the time it filed suit — a jurisdictional defect that cannot now be retroactively cured.  Although "[a]t first glance, that result may smack of a technicality," in fact "it is no mere technicality."  *Alix*, 2024 WL 3293621, at *13.  Put differently, "[m]uch more than legal niceties are at stake."  *Steel Co.*, 523 U.S. at

101.  The demands of Article III standing "serve[] to safeguard fundamental principles of adversary litigation, fairness to litigants, and judicial modesty" and, more broadly, "implement[] 'the Framers' concept of the proper — and properly limited — role of the courts in a democratic society.'"  *Alix*, 2024 WL 3293621, at *14 (quoting *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 379-80 (2024)); *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." (cleaned up)).  Moreover, any judgment reached in this suit would be exposed to the risk of later collateral attack by disappointed CVR investors based on UMB's lack of standing to bring suit.  In any event, the Court has no choice but to dismiss.  And UMB has no one to blame for that result but itself.

Significantly, however, this dismissal is *without prejudice* to the refiling of a new lawsuit by a properly appointed Trustee.  *See, e.g.*, *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54-55 (2d Cir. 2016) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice."); *see also* Oral Argument Tr. 12, 72 (BMS conceding that a properly appointed Trustee could refile suit following dismissal and that the statute of limitations has not yet run).  To be sure, any new lawsuit would likely have to confront the question of who the Trustee is now — namely, whether it is still Equiniti or, as a result of the "reconfirmation" process earlier this year, whether it is *now* UMB.  But that is a question for another day.[5]  For now, it suffices to say that UMB cannot maintain *this* suit.

---

[5]      In the event that a new lawsuit is filed in this District, the plaintiff in that lawsuit should designate it as related to this case in accordance with the Court's Local Rules and Rules for the Division of Business Among District Judges.  Assuming that any such new lawsuit were to survive jurisdictional challenge, the Court would likely pick up where this case left off in terms of motion practice, discovery, and the like.

Accordingly, BMS's motion to dismiss for lack of subject-matter jurisdiction must be and is GRANTED.  The Clerk of Court is directed to terminate ECF No. 73 and to close the case.

       SO ORDERED.

Dated: September 30, 2024
      New York, New York

                                   JESSE M. FURMAN
                             United States District Judge